IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,634

STATE OF KANSAS,
*Appellee*,

v.

LINDSEY NICOLE BLANSETT,
*Appellant.*

SYLLABUS BY THE COURT

1.

Premeditation is not a "culpable mental state" that can be negated by the mental disease or defect defense under K.S.A. 2014 Supp. 21-5209.

2.

When a defendant encourages the jury to infer that the State's evidence is not credible because it failed to admit a certain piece of evidence, the State may refute the inference by informing the jury that the defense has the power to introduce evidence. But in so doing, a prosecutor cannot suggest that a defendant must disprove the State's case.

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed March 8, 2019. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kerwin L. Spencer*, county attorney, argued the cause, and *Derek Schmidt,* attorney general, was with him on the briefs for appellee.

1

The opinion of the court was delivered by

STEGALL, J.: While suffering from a psychotic episode, Lindsey Nicole Blansett stabbed her 10-year-old son, Caleb Blansett, to death. A jury convicted Blansett of first-degree premeditated murder and aggravated assault. On appeal, Blansett challenges the jury instructions concerning her mental disease or defect defense. She also alleges several instances of prosecutorial error and claims cumulative error merits reversal.

At first, Blansett argued that premeditation is a culpable mental state that can be negated by the mental disease or defect defense. But while her case was pending, we decided *State v. McLinn*, 307 Kan. 307, 323, 409 P.3d 1 (2018), and rejected the same argument, holding that premeditation is not a "culpable mental state" under K.S.A. 2013 Supp. 21-5209. We later granted Blansett's request for supplemental briefing to discuss *McLinn*'s impact and raise additional arguments. Now, Blansett argues the jury instructions prevented the jury from considering how the evidence of her mental disease or defect affected her ability to premeditate.

We hold Blansett has failed to establish instructional error because we disagree with her characterization of the jury instructions. Also, we find one instance of prosecutorial error but hold it was harmless. As a result, there are not multiple errors to accumulate and cumulative error does not apply. For these reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Just before midnight on December 14, 2014, the Sumner County 911 dispatcher received a call from Blansett. The first thing Blansett said was, "Hi, this is Nicole Blansett, I just stabbed my son. . . . I thought somebody was coming in to get us." The dispatcher asked Blansett where she had stabbed her son, and Blansett replied, "In the chest. . . . I thought somebody was coming in." After the dispatcher told her to hold on

the line, Blansett exclaimed, "God, what did I fucking do? . . . I'm never gonna get out of jail . . . never. Oh God, you're gonna have to live with dad. Oh, God, why? Why?" and then began crying. When the dispatcher returned to the line, he asked Blansett if her son was breathing. Blansett said she could feel his heartbeat but just "barely."

Officer Sara Owens was the first to arrive at Blansett's house in Wellington. Officer Owens would later testify: "When I walked into the house, I noticed that the house was completely dark, and I saw a white female that I identified as Nicole Blansett, and a young child, who ended up being Cadence Blansett. Nicole was kind of in a daze and Cadence was crying." Officer Owens "found Caleb laying on his back on the bed with blood covering his chest." Caleb had no pulse.

Blansett told Officer Owens that "she had been frightened"; "she thought that something was going to happen"; "she felt like she heard something by the window"; and "her son's toy gun had fallen for no reason." Blansett talked "about having peoples' arms . . . chopped off, people being cut up, Caleb living like a dog, being in pain, and she didn't want her [] son to live like that." Blansett "thought she was saving him from all the years of pain. She didn't specify what kind of pain. Just somebody coming and getting him. Somebody hurting him."

When the EMTs arrived, they found Caleb lying motionless in bed with multiple stab wounds to his left pectoral area. They pronounced Caleb dead at the scene. In the same room, investigators found a knife on the dresser and an 11-pound rock lying next to the bed.

Detective Bobby Wilson interviewed Blansett at the scene of the crime. Blansett told Detective Wilson that she was having financial issues and was depressed. She explained that she had been trying to reconcile with her ex-husband Clint, and he wanted

3

her "to go to mental health" on the following Monday. Blansett had agreed to do so in hopes of reconciling with Clint.

Blansett told Detective Wilson that earlier in the evening she was tending to two puppies she had gotten the children as an early Christmas present. At some point, she took their large adult dog outside. When she came back inside, she took three knives out of a kitchen drawer and laid them on the counter. According to Blansett, she heard a noise and walked through house carrying one of the knives. Turns out, the noise was caused by a toy gun falling off the wall in Caleb's room.

Blansett recalled that she returned to the kitchen, set the knife down, and went back to the dogs. But shortly after, she decided "that Caleb just needed to go to heaven, and he needed to go to heaven that night. She was going to ease his pain. And that's when she made a decision to end his life." Then Blansett went to Caleb's room and stabbed him while he was asleep. As Detective Wilson summarized, Blansett stabbed Caleb once, realized what she had started, and then decided to stab him a couple more times.

Detective Wilson probed why Blansett killed her son. She commented that Caleb was "meek, a weak child." Blansett was hard to follow and "[n]ever gave an exact reason why." But she insisted that "[s]he needed to stop his pain. She needed to save him. And he needed to go to heaven."

After the on-site interview, Detective Wilson took Blansett to the Sumner County jail. Later that morning, Blansett asked to speak with Detective Wilson again, and over the course of three more interviews she discussed the killing and her mental process in more depth.

At the outset, Blansett told Detective Wilson that she had hit Caleb with a rock before stabbing him. She first thought the rock would kill Caleb, and when it did not, she stabbed him. Detective Wilson asked if, after hitting Caleb with the rock, Blansett had to leave the room to get the knife. Blansett said "no." She also told Detective Wilson that Caleb woke up after she hit him with the rock. As Blansett stabbed Caleb, he yelled, "'Mommy, stop. Mommy, stop.'" Cadence also yelled at Blansett to stop. But Blansett kept stabbing and told Caleb that this was the only way he could get to heaven.

When Detective Wilson asked Blansett why she killed Caleb, Blansett said, "I just lost my mind." In the days leading up to the crime, she had not been eating or sleeping well and her mind was racing "nonstop." That day, Blansett believed people were coming to hurt them. She explained, "I thought something bad was gonna happen to them, I thought something bad was gonna happen to me, and I thought that that was the only way that I could save them," and, "I felt like I was being closed in on." Blansett expressed that Caleb would struggle in life and she was doing the best thing for him.

But Blansett also admitted that, as soon as she stabbed Caleb, she "knew it was wrong." Detective Wilson suggested that Blansett premeditated the killing when she retrieved the rock and the knife. Blansett denied this repeatedly and insisted that she did not plan the killing.

The State charged Blansett with first-degree premeditated murder and aggravated assault. At trial, the State's case-in-chief consisted mainly of the testimony of investigators and forensic scientists. Detective Wilson testified for the State and detailed each of the interviews that he conducted with Blansett. Although each of the interviews had been recorded in some manner, only a recording of the third interview was introduced into evidence and played for the jury.

5

The State also called Blansett's friend Ivan Scott to testify. He explained that the night before Caleb's death, Blansett and her kids stayed overnight at his house. He recalled that Blansett "was acting paranoid" that night and worried that someone was in the house.

After the State rested its case, the defense called Dr. Jarrod Steffan, a psychologist, to testify. Dr. Steffan had interviewed and evaluated Blansett. He testified that about a month before Caleb's death, Blansett became "paranoid and suspicious, particularly of her mother and her stepfather." During that time, Blansett claimed she heard her son talking in his sleep like he was having a nightmare, saying "[s]omething to the effect of, 'Stop, Papa, stop.'" Blansett soon "formed the opinion" that her ex-husband was sexually abusing Caleb. Around that time, Blansett also came to believe that she had been sexually abused as a child, though it was unclear to Dr. Steffan whether this had occurred.

According to Dr. Steffan, about a week before Caleb's death, Blansett had attended a church service "about God's wrath and salvation." At this service, the verse Genesis 9:11 stood out to Blansett. She became obsessed with those numbers, thinking about all the times they had come up in her life. She also read chapter 9, verse 11 from other books of the Bible. She then became "very paranoid about what was going on and wasn't sure whether the verses about the references to 911 were coming from God or from the devil. She had an overwhelming sense of fear of terror." She believed that events like September 11, 2001, were "God's way of, what she said, taking out people before really bad things happened. It was a way that God saves people. Brings them into heaven before they—they suffer a calamity essentially."

As Dr. Steffan testified,

"[Blansett] became in the clinical sense what—what a psychologist and psychiatrist would say as—as being very preoccupied and perseverating on that. And those beliefs

6

then morphed into what we call a delusional belief system wherein she was believing that the end times were coming, and she had the sense that—she had this pervasive fearfulness in her life, and she began to believe that Clint, his friends, or other people were going to come into her home, take her two kids, and kill her. And for different reasons she believed that her son wouldn't be able to withstand living with Clint; that Clint would be abusive toward him—toward Caleb; would eventually torture Caleb. . . . And so in her mind she believed that the right thing to do would be to do what God had done through other very bad events, like 9-11, that is, God—God used 9-11 to rescue some people or bring them into heaven so that they would not experience worse types . . . of events. The end times. And so she thought that she had to kill her son in order to prevent him from being taken, and tortured, and ultimately killed . . . by the son's father. But that belief didn't happen until moments before she killed her son. Up until that Sunday night, she had these different thoughts about religion, and the end times, and . . . she said that she was having visions of Caleb being tortured, beaten. I wasn't able to get the sense from her whether they were what we would call visual hallucinations where she was actually seeing things that no one could possibly see. That it was some severe disruption in her mind. Or if it was something that was like a vivid image that was going along with her different thoughts about what was happening. But she reported she was seeing those different things of her son being tortured."

Dr. Steffan concluded that Blansett experienced a change in her mental function about one month before she killed her son, which worsened the week beforehand. He believed that Blansett's mood and sleep changes were consistent with someone who has bipolar disorder and is having a manic episode. As Dr. Steffan explained, during a manic episode a person exhibits a change in risk aversion and has an impaired ability to control impulses.

As for Blansett's ability to form intent, Dr. Steffan testified:

"Well, on the one hand, it's clear in my opinion that she intended to bring about the death of her son, and she did so. Her decision and thought processes and actions in bringing about that death though were based on her mental state, her symptoms of mania, and

7

psychosis. That directly resulted in her killing her son. She had a delusional belief system. . . . She had this delusional belief . . . that other people were coming to get her, and would torture and torment her son, and that she needed to ensure that her son go to heaven and not be subjected to that torture. And the only way to do that was for her to kill her son. And she had other indications of—of the mania and the psychoses at the time. Keep in mind, she hadn't slept. Her thoughts were racing, were very disruptive. She had trouble thinking clearly. She had trouble controlling her impulses. She was overwhelmed with a sense . . . of terror, of fear, of paranoia. And she had what's called persecutory ideation or thought of people coming to get her."

During cross-examination, Dr. Steffan agreed that Blansett had the "goal" of killing her son.

The State called its own expert, Dr. Roy Daum, a psychologist at Larned State Hospital, to testify in rebuttal. Dr. Daum had also interviewed and evaluated Blansett. He testified that Blansett "had a brief psychotic burst or a brief psychotic episode," which he defined as "irratic [*sic*] behaviors over a period from one day up to 30 days but no longer."

Dr. Daum acknowledged that some people who suffer from mental illness "cannot distinguish reality" or "form intent." When the State asked Dr. Daum how he evaluates whether a person with mental illness can form intent, Dr. Daum replied, "By definition for me an intent is—implies goal directed behavior. When I form intent, I have a goal I want to reach. If my actions go toward that goal and I reach that goal, then I have formed intent." According to Dr. Daum, Blansett demonstrated an ability to formulate goals and intent. He explained that "[t]he goal orientation happens in saving. It's not in killing. But it's in saving. I want to save my son from the future of what's coming. And if he goes to heaven, he'll be saved, so he won't experience the kind . . . of abuse that she had experienced."

The jury found Blansett guilty of first-degree murder and aggravated assault. The district court imposed a hard 25 life sentence for the first-degree murder conviction and an 11-month concurrent sentence for the aggravated assault conviction. Blansett appealed directly to this court. See K.S.A. 2018 Supp. 22-3601(b)(3) (permitting appeal from a district court's final judgment directly to the Supreme Court in "any [criminal] case in which a maximum sentence of life imprisonment has been imposed").

ANALYSIS

The facts of this case are horrific and tragic beyond all words. The specter of mental disease and the havoc it can and does wreak in people's lives continues to haunt the criminal law. In cases like this, it remains one of the most difficult and stubborn challenges facing policymakers, legislators, judges, prosecutors, defense attorneys and their clients, law enforcement officers, juries, and society itself. And the criminal law is a blunt instrument of last resort—as this case amply illustrates.

*The flawed jury instructions do not amount to reversible error.*

Blansett challenges jury instruction No. 6, which explained the mental disease or defect defense, and the district court's response to a mid-deliberation jury question about that instruction. The standard of review for jury instructions is well-known:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

9

*denied* [565 U.S. 1221] (2012).'" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

Additionally, this court reviews a district court's response to a mid-deliberation jury question for abuse of discretion.

"'[T]o the extent that it is necessary to determine whether the district court's response was a correct statement of the law, we are presented with a legal question, subject to unlimited review. But when looking at which legally appropriate response the court should have made, we accord the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court.'" *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014) (quoting *State v. Wade*, 295 Kan. 916, 921, 287 P.3d 237 [2012]).

The parties agree that Blansett did not object to either the instruction or the district court's response to the mid-deliberation question. Consequently, the clearly erroneous standard of reversibility applies: if error is found, we must be "firmly 'convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015) (quoting *State v. Cruz*, 297 Kan. 1048, 1066-67, 307 P.3d 199 [2013]); see *Lewis*, 299 Kan. at 855 (applying clear error standard to "nonevidentiary, mid-deliberation jury questions"). Blansett has the burden to prove clear error. *McClelland*, 301 Kan. at 828.

The jury instructions about the mental disease or defect defense read:

"INSTRUCTION NUMBER 6

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. This evidence is to be considered only in determining whether the defendant had the culpable mental state required to commit the crime. The defendant is not criminally responsible for her acts if because of mental

10

disease or defect the defendant lacked the premeditation and the intention to kill Caleb Blansett, or the awareness to knowingly place Caleb Blansett in reasonable apprehension of immediate bodily harm."

"INSTRUCTION NUMBER 7

"If you find the defendant not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required culpable mental state, then the defendant is committed to the State Security Hospital for safekeeping and treatment until discharged according to law."

For the murder charge, the verdict form gave the jury the option of finding Blansett guilty of first-degree premeditated murder, guilty of intentional second-degree murder, or not guilty. If the jurors found Blansett not guilty, they were asked to answer the following special question: "Do you find the defendant was not guilty solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required culpable mental state?"

During deliberations, the jury inquired about the meaning of "culpable." Specifically, the jurors asked, "Definition of culpable? Refer to instruction #6." The discussion between the parties and the judge about how to answer the question is not part of the record. But ultimately the parties agreed upon a response, and the judge read it to the jury in open court:

"'Ladies and gentlemen of the jury:

"'The culpable mental state for the crimes referenced in Instructions Numbered 2 [first-degree murder] and 3 [lesser included offense of second-degree murder] is intentionally.

11

"'The culpable mental state for the crime referenced in Instruction No. 5 [aggravated assault] is knowingly.'"

On appeal, Blansett initially argued the district court erred when it instructed the jury that she was not criminally responsible for her acts if, because of mental disease or defect, she "lacked the premeditation *and* the intention to kill Caleb Blansett." (Emphasis added.) In her view, this instruction foreclosed the possibility that her mental disease or defect defense could negate premeditation independent of the jury's finding on intent, which could reduce the crime from first-degree premeditated murder to second-degree intentional murder. Blansett also claimed the court's response to the jury question misstated the law because it did not list premeditation as a culpable mental state.

Thus, the crux of both arguments was the premise that premeditation is a "culpable mental state" that can be negated by the mental disease or defect defense. K.S.A. 2014 Supp. 21-5202(a) ("Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'"). As K.S.A. 2014 Supp. 21-5209 states: "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the *culpable mental state* required as an element of the crime charged. Mental disease or defect is not otherwise a defense." (Emphasis added.)

While Blansett's case was pending, we decided *State v. McLinn*, 307 Kan. 307, 409 P.3d 1 (2018), which held:

"Under K.S.A. 2013 Supp. 21-5209, a criminal defendant may present a mental disease or defect defense to establish he or she lacked the culpable mental state required as an element of the charged crime. In turn, K.S.A. 2013 Supp. 21-5202(a) defines the phrase 'culpable mental state' as including conduct performed 'intentionally,' 'knowingly,'

12

or 'recklessly.' It does not list premeditation as a culpable mental state. Consequently, a district court does not err by omitting any reference to premeditation in a jury instruction regarding the defense of mental disease or defect." 307 Kan. 307, Syl. ¶ 1.

Thus, *McLinn* clarified that premeditation is not a "culpable mental state" that can be negated by the mental disease or defect defense under K.S.A. 2014 Supp. 21-5209. Blansett later moved to file a supplemental brief to address *McLinn*'s impact and raise additional arguments. We granted the motion and scheduled supplemental briefing.

In the second round of briefing, Blansett does not contest that *McLinn* applies prospectively or ask us to overturn it. See *State v. Mitchell*, 297 Kan. 118, 124-25, 298 P.3d 349 (2013) ("The general rule . . . is that a change in the law acts prospectively, applying only 'to all cases, state or federal, pending on direct review or not yet final.'"). Indeed, *McLinn* resolves Blansett's first set of arguments—instruction No. 6 was not legally required to mention premeditation *at all*, and the district court was correct to omit premeditation as a culpable mental state in its response to the jury question. In fact, the inclusion of premeditation in instruction No. 6 was technically a misstatement of the law as set forth in *McLinn*. Blansett, however, does not complain about this "error" on appeal.

Given this, Blansett now tries to sidestep *McLinn*. She claims instruction No. 6's statement that evidence of mental disease or defect "is to be considered *only* in determining whether the defendant had the culpable mental state required to commit the crime," when combined with the district court's response to the jury question, effectively told the jury not to consider evidence of mental disease or defect with respect to the element of premeditation. (Emphasis added.) Based on this characterization of the instructions, she argues:  (1) that evidence of mental disease or defect is relevant *independent of* K.S.A. 2011 Supp. 21-5209 to negate the element of premeditation, and (2) that preventing the jury from considering this relevant evidence is unconstitutional because it deprives her of the right to present a defense and the right to a fair trial.

13

But we need not reach the merits of Blansett's new arguments because we disagree with her characterization of the instructions. Contrary to her claim, the jury instructions as a whole did *not* prevent the jury from considering how Blansett's mental disease or defect affected her ability to premeditate. In fact, they suggested the very opposite. As instruction No. 6 stated:  "The defendant is not criminally responsible for her acts if because of mental disease or defect the defendant lacked *the premeditation and the intention* to kill Caleb Blansett." (Emphasis added.) This instruction conveyed that Blansett's mental disease or defect could impact her ability to premeditate and thus remove her criminal responsibility. The district court's response to the jury question was potentially confusing. But in context, it did not directly contradict instruction No. 6 or prevent the jury from following the command contained in instruction No. 6 that the jury consider the evidence of mental disease or defect as that evidence related to the State's burden to prove premeditation.

In sum, Blansett has failed to establish error because, based on *McLinn*, premeditation is not a culpable mental state that can be negated by the mental disease or defect defense, and, based on the facts here, the instructions did not prevent the jury from considering how Blansett's mental disease or defect otherwise affected her ability to premeditate.

*The single instance of prosecutorial error was harmless.*

Blansett also argues the State committed reversible prosecutorial error during closing arguments when it engaged in improper burden-shifting, misstated the evidence about her intent, erroneously equated the formation of intent with premeditation, and misstated that Blansett had testified. We hold the State committed one instance of prosecutorial error when the prosecutor mistakenly said that Blansett had testified, but this error was harmless.

14

This court "employ[s] a two-step process to evaluate claims of prosecutorial error," which "should be simply described as error and prejudice." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. Second, "[i]f error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109. The constitutional harmlessness test from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), applies. *Sherman*, 305 Kan. at 109. That means prosecutorial error is harmless "if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Blansett argues the State engaged in improper burden shifting when it commented that defense counsel could have admitted the videotapes of Blansett's interviews into evidence. But, as we have often said, context matters. See *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018) ("Appellate courts consider the prosecutor's comments in the context in which they were made rather than in isolation."). And to put this remark in context, we must begin with defense counsel's closing argument.

In closing argument, defense counsel focused on the "unanswered questions" of the case, including certain recordings that were not played for the jury. During its case-in-chief, the State had played a recording of one of Blansett's interviews with police. But otherwise, the State had entered her interview statements into evidence through the testimony of law enforcement. Defense counsel seized upon this tactical decision to argue

15

the State was hiding "helpful" evidence. For example, defense counsel questioned why the State would not play Blansett's first interview for the jury, stating:

> "Now, that interview was recorded. I think we talked about she had [a microphone] on her lapel or what have you. You didn't get to listen to that interview, did you? They didn't play it for you. That could have been helpful. Again, to hear what was said. The voice inflection. The tone of the voice. The loudness of the voice. Perhaps the trembling of the voice, but you didn't get to hear that, folks."

In the same vein, defense counsel also commented about another interview, "[T]hat interview was recorded. Audio and video. Didn't get to see it, did we?" Finally, in his closing remarks, defense counsel emphasized that "there's some unanswered questions that need to be addressed by the government" and asked, "How come they wouldn't show you the other interviews or have you listen to them? How come we're just picking one to show you?" Thus, defense counsel weaved the "unanswered questions" thread—which suggested the State was hiding evidence that might help Blansett—throughout closing argument.

The State began its rebuttal argument by addressing the recordings that were not played for the jury. The prosecutor said,

> "All right. Let's deal first with what was introduced and what wasn't introduced. [Defense counsel] is obviously very competent counsel. If there was something in one of those other potential videotapes that he wanted you to see, he could['ve] introduced that into evidence, and you could['ve] seen it as a result of his introduction of evidence."

At that point, defense counsel objected. The district court sustained the objection and told the jury: "Disregard those comments. The defendant has no burden to present evidence in this case. [The prosecutor] misspoke." The prosecutor then reframed his argument and told the jury,

16

"You can't speculate on what other things there are that's out there. You have to base your decision solely upon the evidence that you heard here in the courtroom . . . . You shouldn't conclude one way or the other about other things being helpful or not helpful to anybody. You need to base your decision solely upon what it is that you heard, and what it is that you saw."

Kansas caselaw provides that it is "'"improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof."'" *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014) (quoting *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 [2012]). But even so, "'"considerable latitude [is] granted to prosecutors to comment on the weakness"' of the defense." *Williams*, 299 Kan. at 939 (quoting *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 [2010]).

In *Williams*, defense counsel rhetorically asked during closing argument why the State did not present more witnesses to corroborate the victim's account, though the evidence suggested corroborating witnesses existed. In rebuttal, the State commented that "'[*t*]*he defense has subpoena power identical to the State*.'" 299 Kan. at 937. On appeal, Williams argued the State's response constituted improper burden shifting. We disagreed based on a line of cases involving comments about a party's subpoena power that "dr[ew] a line indicating a prosecutor cannot suggest a defendant must disprove the State's case." 299 Kan. at 939. But otherwise,

"if a defendant asks the jury to draw an inference that the State's evidence is not credible because the State did not call a witness to corroborate other evidence, we have held that the State can refute the inference by informing the jury that the defense has the power to subpoena witnesses, including those who would be favorable to the defense." 299 Kan. at 939.

17

Applying these principles, we held the prosecutor's statements fell within the wide latitude of fair argument because they "did not call upon the defense to disprove the occurrence of the crime." *Williams*, 299 Kan. at 941. See, e.g., *State v. Naputi*, 293 Kan. 55, 64, 260 P.3d 86 (2011) (holding that it was not improper for the State to respond to defense counsel's "purported inference" that the State refused to call a witness beneficial to the defense "by pointing out that if the [witness] would have been helpful to the defense, the defense could have subpoenaed him").

So too here. Defense counsel's closing argument asked the jury to infer that the State was hiding evidence "helpful" to the defense. In response, the State informed the jury that the defense could have introduced those recordings into evidence. This response falls easily in step with our caselaw involving the State's comments about the defense's subpoena power, and the line we draw is the same. When the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence. But in so doing, a prosecutor cannot suggest that a defendant must disprove the State's case. Here, the prosecutor's comments fell within the wide latitude to refute the inference that it was hiding evidence from the jury, and it did not suggest the defense bore the burden to disprove the crimes charged.

Blansett's remaining challenges arise from one segment of the State's rebuttal argument, when the prosecutor argued Blansett formed the premeditation and intent to kill her son:

> "I think that Miss Blansett knew what she was doing when she picked out a knife and carried it around. . . . I submit it's reasonable for you to conclude that . . . the plan was that she was going to kill her son in order to . . . save him from a worse life in the future. . . . [S]he took actions that were very, very consistent with that intent. She took a knife into the bedroom. . . . So she formulated a plan. She went and got a rock. The rock just doesn't happen to be there in the bedroom. She went into the bathroom and got the

18

rock and brought it back to the bedroom. I submit she had to have two trips. She had to have at least two trips. One to bring the knife in there and the other one to bring the rock in there. And there wasn't any other reason ever given for why she was carrying this rock around except to do injury to her son. Except to kill her son.

"Now there is—

"THE COURT: There was evidence of another intention. You're misstating the evidence.

"[The State]: Well, I apologize, Your Honor. I certainly did not do that intentionally. I knew that there was evidence of other intent with the knife, and I was getting ready to cover the other intent with the knife.

"Let me summarize. You are the ultimate decider of what the evidence was. And certainly if I have—I have not intentionally misstated something, but you ultimately will decide that. But let me go to what I know there was evidence about reference to the knife. I know that there was evidence about the knife that she was going on patrol and was carrying the knife around as potential protection. And I recall that in her testimony."

At that point, defense counsel objected, noting Blansett had not testified. The prosecutor immediately rephrased: "In the testimony from other people repeating what the defendant said." The judge then thanked the prosecutor for making the correction.

Based on this exchange, Blansett argues the prosecutor misstated the evidence about her intent with the knife and erroneously equated the formation of intent with premeditation. Neither argument is persuasive. First, Blansett claims the State's closing argument ignored her statements that she brought the knife into the bedroom for protection. Initially, the prosecutor argued the only reason Blansett carried the weapons into the bedroom was to kill her son. But moments later, after the court interrupted stating there was other evidence of intent, the prosecutor continued: "I was getting ready to cover the other intent with the knife. . . . I know that there was evidence about the knife

19

that she was going on patrol and was carrying the knife around as potential protection." Viewing the State's argument as a whole, the prosecutor did not misstate the evidence of Blansett's intent with the knife and thus did not commit error.

Second, Blansett argues the State equated the formation of intent with premeditation, making the two elements indistinguishable. She claims these elements became blurred when the prosecutor argued that multiple stab wounds were evidence of premeditation. She cites *State v. Marks*, 297 Kan. 131, 137, 298 P.3d 1102 (2013), in support, which held it was erroneous for a prosecutor to state that the intent to kill was formed "'during the act [of stabbing] itself.'" Based on the unique facts of that case, we concluded that this comment "confused the formation of premeditation from what was instructed." 297 Kan. at 139. But the State's comments here bear no resemblance to those at issue in *Marks*—the prosecutor did not argue that premeditation was formed *while* Blansett stabbed Caleb. Instead, the State argued Blansett formed the premeditation *while* she retrieved the rock and the knife.

Evidence of several stab wounds can be a factor supporting a finding of premeditation. When this court reviews a challenge to the sufficiency of the evidence of premeditation, it considers, among other things, circumstantial evidence of "'the nature of the weapon used'" and "'the dealing of lethal blows after the deceased was felled and rendered helpless.'" *State v. Smith-Parker*, 301 Kan. 132, 153, 340 P.3d 485 (2014) (quoting *State v. Hollister*, 300 Kan. 458, 470, 329 P.3d 1220 [2014]). Consequently, it was well within the prosecutor's wide latitude to argue the nature of the weapons used and the multiple stab wounds were circumstantial evidence of premeditation.

Finally, we hold the prosecutor misstated the evidence by commenting in passing that Blansett had testified when she had not done so. See *State v. Sturgis*, 307 Kan. 565, 570, 412 P.3d 997 (2018) ("Under our current analysis, a prosecutor commits error by misstating the evidence, even when the misstatement is accidental or inadvertent."). But

20

this error was harmless when viewed in context—defense counsel immediately objected, the district court sustained the objection, and the prosecutor promptly clarified that Blansett had not testified. Put simply, the misstatement was repaired quickly, and in light of the trial as a whole, it was not a "game-changer." 307 Kan. at 570. And this single error "'is insufficient to support reversal under the cumulative effect rule.'" *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013).

Affirmed.

JOHNSON, J., concurs in the result.

\* \* \*

BEIER, J., dissenting: I must dissent in this case because I have not changed my mind about whether premeditation qualifies as more than a merely temporal gloss on the culpable mental state of intention. See *State v. McLinn*, 307 Kan. 307, 355-62, 409 P.3d 1 (2018) (Beier, J., dissenting). Premeditation is its own culpable mental state under Kansas law; it has always differed qualitatively as well as quantitatively from intent and required distinctive proof; nothing about the 2011 recodification of the criminal code changed any of that. *McLinn*, 307 Kan. at 355-56, 360-61 (Beier, J., dissenting).

I would therefore hold that the district judge's inclusion of "premeditation" in instruction No. 6 as an element of first-degree murder whose existence could be defeated by proof of defendant Lindsey Blansett's psychosis was a correct statement of the law.

That much said, I do not agree with Blansett that instruction No. 6's further language limiting consideration of evidence of Blansett's mental disease or defect "only" to "determin[e] whether the defendant had the culpable mental state required to commit the crime," when given to the jury with the rest of the instructions, was confusing at the

21

time the jury heard it. Rather, I think it reinforced an unavoidable impression the lay jury would have had to take from the instructions, read as a whole: Premeditation, in addition to intention, qualifies as an independent culpable mental state.

Instruction No. 2 told the jury simply that a conviction for first-degree murder required the State to have proved that Blansett "intentionally killed" her son and that "[t]he killing was done with premeditation." Footnotes appended to instruction No. 2 elaborated on the meaning of "intentionally" and "premeditation":

> "A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the state, or cause the result complained about by the state."

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premedi[t]ation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Instruction No. 2 did not tell the jury that intention was the only culpable mental state at issue in this case. I am convinced it unavoidably implied the opposite.

The only other instruction mentioning culpable mental state was instruction No. 7, which told the jury that Blansett would be committed to the State Security Hospital if found not guilty "solely because the defendant, at the time of the alleged crime, was suffering from a mental disease or defect which rendered the defendant incapable of possessing the required culpable mental state." Again, this instruction did not eliminate premeditation as a culpable mental state Blansett's jury must reckon with.

The situation changed when the judge responded to the jury's mid-deliberation question, however. It was then that legal error arose, when jurors were told unequivocally

22

that intention was the only culpable mental state that mattered for first-degree premeditated murder. Once that response went to the jury, the "only" language in instruction No. 6 became the problem Blansett and her appellate counsel describe. With a narrow definition of culpable mental state supplied, it prevented the jury from considering Blansett's undisputed contemporaneous psychosis as competition for the State's evidence of her actions from which the jury might infer the existence of premeditation.

Although Blansett faces a high burden on reversibility under the clearly erroneous framework, the significance of the error described above is hard to overestimate. It eliminated Blansett's only promising defense, a mental disease or defect so grave and disorienting that it may have compelled her to kill her 10-year-old son while she was in what she and her expert described as a fit of paranoid and sudden panic. I would therefore reverse her conviction for first-degree premeditated murder, vacate her sentence, and remand this case to the district court for further proceedings. I am firmly convinced that a jury—correctly rather than incorrectly guided by the trial judge—would have reached a different verdict, one that took *all* of the evidence from these devastating events into account.