IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 128,013


STATE OF KANSAS,
*Appellee*,

v.

EFRAIN D. ARROYO,
*Appellant*.


SYLLABUS BY THE COURT

1.

Kansas appellate courts apply a two-step framework when reviewing claims of prosecutorial error. First, the court considers whether the prosecutor exceeded the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. The court does not consider any statement in isolation but rather looks to the context to determine whether error occurred. Second, if the court finds error, the State must show beyond a reasonable doubt that the error did not affect the trial's outcome in light of the whole record, i.e., that there is no reasonable possibility that the error contributed to the verdict.


2.

Prosecutors generally err if they comment, even indirectly, on a defendant's failure to testify.


3.

When the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, a prosecutor does not

necessarily err by informing the jury that the defense has the ability to introduce evidence, which rebuts the defense's inference.

Appeal from Sedgwick District Court; ERIC WILLIAMS, judge. Oral argument held October 28, 2025. Opinion filed February 13, 2026. Affirmed.

*Kristen B. Patty*, of Wichita, argued the cause and was on the brief for appellant.

*Kristi D. Allen*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

WALSH, J.: Efrain D. Arroyo directly appeals his jury convictions and sentence for first-degree felony murder, aggravated kidnapping, criminal use of weapons, and driving a vehicle without the assigned tag. He asserts that prosecutorial error in closing argument and failure to instruct the jury on two lesser included offenses warrant reversal, either separately or cumulatively. Because the prosecutor's challenged comment was not, in context, erroneous, and because failure to give the requested lesser included offense instructions was harmless, individually or collectively, we affirm the convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

Early on the morning of November 27, 2019, Christian Hernandez was bound with rope around his hands and waist, taken to a dirt road beside a field north of Wichita, and shot four times in the back of the head. A passerby discovered his body and called police. When police arrived at about 7:22 a.m., his body was still warm despite the chill of the morning. In addition to the four gunshot wounds—all of which passed straight through Hernandez' head, with three bullets embedding in the dirt—Hernandez had abrasions

2

and/or contusions on his head, back, right hand, and legs, along with abrasions on his wrists where they had been bound with rope behind his back. Forensic evidence suggested that Hernandez was probably face down in the dirt for at least one of those shots, which likely all came from the same 9-millimeter firearm. Police collected four 9-millimeter shell casings from the scene, as well as two lottery tickets from Hernandez' back pocket that were traced to a QuikTrip where he had purchased them at 1:35 a.m. that morning.

Like his then-girlfriend, S.B., and like most of the non-law enforcement witnesses involved in this case, Hernandez was deeply involved with illegal drugs and was using methamphetamine around the time of his death. S.B. reported that, in the days leading up to his killing, Hernandez had been worried that "Monster"—his name for Arroyo—would be looking for him "whenever he gets out" because Hernandez had sold Arroyo's truck without permission. And a few weeks before his killing, Hernandez had texted a cousin that he expected his dangerous lifestyle to catch up with him soon.

According to S.B., she and Hernandez bought lottery tickets at QuikTrip at about 1:30 a.m. and headed home. While driving in their white Ford Crown Victoria, they spotted a white Chevrolet Avalanche driven by Alejandro Arce. S.B. saw a passenger she did not recognize, and could see movement in the Avalanche's backseat, but could not see who was sitting there. The Avalanche stopped upon seeing them, Hernandez talked with Arce, then the Avalanche turned and followed them to the residence Hernandez and S.B. shared. Once the Avalanche arrived, Hernandez went to talk to its occupants. Hernandez then told S.B. he would be "back" and left with the Avalanche. S.B. never saw him again. About 45 minutes after he left, the Crown Victoria disappeared.

According to Arce—who gave multiple false versions of events to police and was eventually charged with interference with law enforcement and kidnapping but testified at Arroyo's trial under a grant of immunity—Arroyo initially picked Arce up so they

3

could "go look for this white truck that [Hernandez] had sold to some guys." After they encountered Hernandez and S.B., Arroyo asked Arce to drive; Hernandez got in the front passenger seat, while Arroyo sat behind him. Arroyo told Arce to drive but gave him no destination. Shortly after they left Hernandez' residence, Arroyo "went off" on Hernandez over "that truck"; Hernandez sat calmly, though Arce believed he was scared. While yelling about the truck, Arroyo drew a black Beretta 9-millimeter handgun and pointed it at the back of Hernandez' head.

After deciding he wanted no part of whatever Arroyo had planned, Arce stopped the Avalanche on a dirt road and got out. Although Arce thought they were "both going to die," Arroyo got in the driver's seat and sped away. Arce made his way home and did not see Hernandez again.

Meanwhile, Arroyo drove the Avalanche to a residence in Wichita where several individuals who used and/or sold methamphetamine lived, including Dustyn Brown and Thomas Armstrong. Security cameras in front of the house and in the living room captured Arroyo's arrival and departure at three different points on the fatal morning.

The Avalanche first arrived at Brown and Armstrong's residence at about 2:42 a.m. Arroyo got out of the driver's seat, while Hernandez got out of the passenger seat. Arroyo handed Brown an SKS rifle so he could pat Hernandez down; Hernandez was unarmed. Inside the residence, Arroyo had Hernandez empty his pockets. According to Brown—who had also given inconsistent statements, had multiple felony convictions, and who received a promise of immunity during Arroyo's trial—Arroyo was talking about a stolen truck: "He said that this guy, Hernandez, had stolen his truck or sold his truck. And if that's the case, he was going to kill him." Arroyo asked Brown for duct tape or rope, and Brown provided duct tape.

4

Arroyo asked Brown to accompany him to get Hernandez' car, but when Brown declined and gave Arroyo his rifle back, Armstrong volunteered so Brown would not have to go. At Arroyo's direction, Armstrong drove the Avalanche while Arroyo sat in the back; as before, Hernandez sat in the front passenger seat. When they arrived at Hernandez' place, Arroyo handed Armstrong the keys and told him to drive Hernandez' Crown Victoria back to the residence he shared with Brown. The Avalanche, with Arroyo still at the wheel, returned to that address at about 3:26 a.m. At this point, Hernandez was no longer wearing a sweatshirt or shoes.

Armstrong dropped the Crown Victoria off a few minutes later and reunited with Arroyo and Hernandez. The three departed at about 3:38 a.m., with Armstrong again at the Avalanche's wheel.

Armstrong was told to drive to Arroyo's parents' house. When they arrived, all three got out and went to the garage. Arroyo made Hernandez get on his knees and put a beanie hat on Hernandez' head; Armstrong walked out at that time because "I didn't want no part of that." Armstrong had just started up the Avalanche when Arroyo and Hernandez exited the garage; Arroyo was holding a rope tied around Hernandez' waist. When Arroyo attempted to tie the other end of the rope to a handle in the Avalanche, Armstrong told Arroyo he would not drive if the rope was tied because he was "not trying to catch no kidnapping charge." Forensics experts would later testify that Arroyo could not be excluded as a contributor of DNA later found in multiple locations on the rope.

The Avalanche returned to the Brown and Armstrong address one last time at 4:18 a.m. After dropping off Armstrong, Arroyo got in the driver's seat and departed.

The Avalanche's whereabouts are uncertain after 4:18 a.m. But at some point later that day, it was towed from an address on North Hillside. Police later impounded and

5

searched the Avalanche. Inside, investigators found Hernandez' blood on the Avalanche's front passenger seat and Arroyo's fingerprints on the driver's window.

Arroyo visited both Arce and Brown after Hernandez' death. Arce claimed that Arroyo—now no longer driving the Avalanche—arrived at his place between 9:00 and 10:00 a.m. This, according to Arce's trial testimony, is when Arroyo told Arce that Hernandez was "gone" and that he had taken "like, three of them to the face." Brown also claimed that Arroyo arrived at his address later that day, now driving a black Malibu. During the visit, Arroyo asked Brown to get rid of both the Malibu and Hernandez' car, the white Crown Victoria. Arroyo returned either the next day or the day after, driving yet another car. Arroyo explained to Brown that he was no longer driving the Avalanche "because the Avalanche had blood in it because he had to punch somebody in the mouth."

Three days after Hernandez' death, police arrested Arroyo during a routine traffic stop while he was driving a white Chevrolet Tahoe with a temporary tag registered to a Hyundai Accent. An SKS rifle with ammunition was in the backseat.

The State charged Arroyo with one count each of first-degree felony murder and aggravated kidnapping; in a separate case, it also charged him with one count each of criminal use of a weapon and driving a vehicle without the tag assigned. The district court granted the State's later motion to consolidate both cases for trial.

The consolidated cases went to jury trial on November 14, 2023. Arroyo did not testify and presented no witnesses. At the jury instruction conference, Arroyo's counsel requested instructions on simple kidnapping and on criminal restraint as lesser included offenses of aggravated kidnapping. As discussed below, the district court denied these requests.

6

The jury found Arroyo guilty on all counts. The district court later sentenced Arroyo to a life sentence without the possibility of parole for 25 years for the murder conviction, 186 months for the aggravated kidnapping, 9 months for criminal use of weapons—all run consecutive—and a $500 fine for driving a vehicle without the tag assigned. This is Arroyo's direct appeal.

ANALYSIS

I.     *The Prosecutor Did Not Commit Error in Closing*

Arroyo argues that the prosecutor's following remark during rebuttal constituted reversible prosecutorial error:

> "[I]f there is a piece of evidence they want you to see or a witness that they think you should hear from that helps their cause, they have just as much opportunity to put that before you as we do."

Arroyo claims this comment impugned his failure to testify or present witnesses, sought to penalize him for having a jury trial in the first place, and "suggested that [he] had to disprove the prosecution's case," all in violation of his Fifth and Sixth Amendment rights under the United States Constitution and section 10 of the Kansas Constitution Bill of Rights.

Arroyo's counsel raised the issue in a motion for a new trial but had not contemporaneously objected. The absence of a contemporaneous objection during closing arguments does not render claims of prosecutorial error unpreserved. That said, an appellate court may consider whether an objection was raised in its analysis of any alleged misconduct. *State v. Timley*, 311 Kan. 944, 949, 469 P.3d 54 (2020).

7

Kansas appellate courts apply a two-step framework when reviewing claims of prosecutorial error. First, we consider whether the prosecutor exceeded the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). The court does not consider any statement in isolation but rather looks to the context to determine whether error occurred. *Timley*, 311 Kan. at 949-50.

Second, if the court finds error, the State must show beyond a reasonable doubt that the error did not affect the trial's outcome in light of the whole record, i.e., that "there is no reasonable possibility that the error contributed to the verdict." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *King*, 308 Kan. at 30. The court may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. *Blevins*, 313 Kan. at 437.

Arroyo argues that the prosecutor's remark was harmful in three ways. First, he claims that it "was a direct and unequivocal comment on [his] failure to testify or otherwise present any evidence in his defense," as proscribed by *Griffin v. California*, 380 U.S. 609, 614, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). Second, he argues that the prosecutor "sought to penalize" him for having a jury trial in the first place. Finally, Arroyo claims that the prosecutor "suggested that Arroyo had to disprove the prosecution's case" in violation of *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004).

Arroyo's framing implies that the prosecutor's comment was contextless and unprovoked. Viewed in isolation, the comment might give us pause. But when placed in context, it falls well within the wide latitude afforded prosecutors to comment on the evidence and respond to argument. See, e.g., *State v. Williams*, 299 Kan. 911, 937-42, 329 P.3d 400 (2014), *abrogated on other grounds by State v. Stubbs*, 320 Kan. 568, 570 P.3d 1209 (2025).

8

The prosecutor's words—which occurred at the beginning of rebuttal—appear to respond directly to the following arguments made during Arroyo's counsel's closing:

"We talked in jury selection about the burden of proof. The State gets to go first, and the State gets to call all the witnesses they want to call first. And last. They get to go last. When I have to sit down forever, one of my colleagues will get up and speak to you the last time. So you're going to hear from them first and last every time. I said, wait. We're in the middle because they have the burden of proof. They have the FBI, the KBI, the sheriff, the W.P.D., the Bel Aire Police, the Park City cops, or whatever they need, they have the power. He gets me. He gets me. And because of that imbalance of power, they have the burden of proof.

"I want to talk about some of the benefits that the State enjoys that we don't. Do you know what would happen to me if I went to a witness and I said, hey, I know you're looking at 51 years in prison, but let me tell you what, here is 14 paragraphs of a contract I wrote up. If you stick to this, I'll come before a judge later on and we'll get you probation. You know what would happen to me? I would go to jail. I would go to jail. Because we're not allowed to offer benefits in exchange for testimony. They get the burden of proof, and they have the power. But the only party that gets to offer benefits in exchange for testimony is not the defense, folks. It's not us."

In wrapping up his closing, Arroyo's counsel also said:

"We did our best. I have to sit down and I have to shut up. They get their last word. But I would ask that—you heard the evidence. Make the response in your own mind that I would make if I could."

With these insinuations of unfairness in mind, the prosecutor's full rebuttal comment—of which Arroyo omits roughly the first half—focused on the State's burden:

"I want to make something perfectly clear. It is our burden. It never shifts to the defendant. They don't have to do anything. But do not be misled for a moment that if there is

9

a piece of evidence they want you to see or a witness that they think you should hear from that helps their cause, they have just as much opportunity to put that before you as we do. So don't be misled by that."

The prosecutor then pivoted to the defense's main point: that the State's witnesses were all unsavory, untrustworthy people who were trading lies in exchange for immunity. The prosecutor did not return to the subject of the power imbalance between the parties.

Thus, when placed in context, the prosecutor's remarks are tailored towards refuting Arroyo's implication that the defense was effectively powerless in the face of the endless resources of the State, which included the purchase of testimony. And by prefacing her remark with a reassurance that the defense did not "have to do anything" and that the burden of proof always remained with the State, the prosecutor seems to have adequately mitigated any risk that the jury would infer "that Arroyo had to disprove the prosecution's case," as Arroyo suggests. Similarly, there is no reasonable way to characterize the remark as an attempt to "penalize" Arroyo for having a jury trial. Nor do we agree that the prosecutor's remark was in any way "a direct and unequivocal comment on [his] failure to testify or otherwise present any evidence in his defense."

Of course, it is generally error for a prosecutor to comment, even indirectly, on a defendant's failure to testify. *State v. Martinez*, 311 Kan. 919, 922, 468 P.3d 319 (2020). However, as this court recently articulated:

> "Often the line between permissible and impermissible argument is context dependent. We thus do not consider a prosecutor's statement in isolation. We ask whether the language used was outside the wide latitude allowed a prosecutor because it was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify or to shift the burden of proof. If so, it is error. But if the statement is merely a fair comment 'pointing out a lack of evidence to support a

10

defense or to corroborate a defendant's argument regarding holes in the State's case,' it is generally not error. [Citations omitted.]" *Martinez*, 311 Kan. at 923.

In light of the defense's arguments about "the benefits that the State enjoys that we don't" and the "imbalance of power," we see no error in the prosecutor reminding the jury that, although the State bears the burden of proof, a defendant has the ability to offer evidence too. In context, the prosecutor's comment is not an impermissible comment on Arroyo's failure to testify. Nor could the jury have drawn that connection, since the prosecutor never mentioned Arroyo's failure to testify and, instead, spent the rest of rebuttal discussing the evidence.

The State also offers an alternative explanation: that the prosecutor was responding to Arroyo's counsel's arguments that the State failed to present various pieces of evidence throughout trial. This characterization appears equally valid. As we have explained, "'[w]hen the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence.'" *State v. Hachmeister*, 311 Kan. 504, 516, 464 P.3d 947 (2020) (quoting *State v. Blansett*, 309 Kan. 401, 415, 435 P.3d 1136 [2019]). Defense counsel's closing argument was replete with such implications, for example: "[I]f they wanted you to see [a videotaped interview with Arce], you could see whether he was shown that photograph or not."; "Interestingly enough, we never hear from Armstrong's girlfriend."; suggesting that the prosecution only played "a little snippet" of a much longer surveillance video because "that doesn't fit [the] narrative very well"; suggesting that the State's "12 photos" failed to give a "good understanding" of the people, vehicles, and guns involved, while the defense's photos presented a more complete picture; and complaining that the State failed to present phone records or testimony from Arroyo's parents. The prosecutor's remarks appropriately responded to these attacks by reminding the jury that the defense could have introduced evidence as well.

11

Whether she was refuting insinuations of unfairness by the State or responding to arguments that the State failed to admit certain evidence, we conclude that the prosecutor's challenged remark, in light of the context within which it was made, was not error.

II.    *Assuming the District Court Erred by Failing to Provide Requested Instructions on Lesser Included Offenses of Kidnapping and Criminal Restraint the Errors Were Harmless*

Arroyo next argues that the district court erred by refusing to give requested instructions on the lesser included offenses of kidnapping and criminal restraint.

When presented with a challenge to jury instructions that were requested but not given, Kansas appellate courts apply a multi-step analysis: (1) first, the appellate court considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court determines whether the instruction was legally appropriate, using an unlimited standard of review; (3) then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless. See, e.g., *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012). Here, where any error does not impact a constitutional right, we assess harmlessness by considering whether there is a reasonable probability that the error could have or did affect the outcome of the trial in light of the entire record. E.g., *State v. Becker*, 311 Kan. 176, 181, 459 P.3d 173 (2020).

The parties both acknowledge that simple kidnapping, defined in K.S.A. 2018 Supp. 21-5408(a), and criminal restraint, defined in K.S.A. 2018 Supp. 21-5411, are

12

lesser included offenses of aggravated kidnapping, defined at K.S.A. 2018 Supp. 21-5408(b). *State v. Harris*, 310 Kan. 1026, 1035, 453 P.3d 1172 (2019) (quoting *State v. Simmons*, 282 Kan. 728, 742, 148 P.3d 525 [2006]). Thus, both instructions would have been legally appropriate. Further, the State concedes that the two requested instructions were factually appropriate here and thus the district court erred in refusing to provide these instructions to the jury.

Based on these concessions, we move directly to evaluate the harmlessness of the error. See, e.g., *State v. Barnes*, 320 Kan. 147, 176, 563 P.3d 1255 (2025). Because Arroyo's counsel requested both instructions, the error in failing to give them is reversible if the court "determine[s] that there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *Plummer*, 295 Kan. at 168.

Arroyo claims—based on the roughly three-hour gap between when Hernandez was last seen alive and when his still-warm body was found—that the jury could have concluded that someone else killed Hernandez (implicating at most simple kidnapping on his part, which does not include the actual infliction of bodily injury element of aggravated kidnapping). Or that Arroyo did not restrain Hernandez' liberty by force or threat (implicating criminal restraint, which does not include the taking or confining by force or threat element of simple kidnapping). The argument relies entirely on the idea that the jury could have reasonably concluded that Arroyo's involvement ended well before Hernandez was shot or before the rope lacerated his wrists. On our review of the record, we can see no reasonable probability of this outcome.

First, to convict Arroyo of simple kidnapping under K.S.A. 21-5408(a), the jury would have needed to conclude that, by force or threat, Arroyo intended to hold Hernandez to inflict bodily injury on him, terrorize him, or otherwise facilitate flight from or the commission of a crime, but that someone else actually inflicted the injuries and killed Hernandez.

13

To convict of criminal restraint under K.S.A. 21-5411, the jury would have had to similarly reject that Arroyo was responsible for Hernandez' injuries and death, and would also have had to reject that Arroyo used "force" or "threat" to take or confine Hernandez, and rather simply interfered substantially with Hernandez' liberty.

If either of these scenarios were reasonably probable, the jury would have simply acquitted Arroyo of the felony-murder count in the first place: Arroyo was not charged with aiding and abetting felony murder, but with actually killing Hernandez himself.

Even so, the burden of proving harmlessness rests with the State. Cf. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012). The State's case was not ironclad. The evidence was entirely circumstantial: nobody testified to *seeing* Arroyo hurt Hernandez, after all. Even Armstrong, who first reported seeing Hernandez with a rope tied around his waist, did not see Arroyo *tie* the rope and did not report seeing the rope tied around Hernandez' wrists—although Armstrong's testimony that Arroyo had also covered Hernandez' head with a beanie and forced him to get on his knees hardly inspires confidence in the innocence of his intentions. Armstrong, like most of the witnesses involved, suffered from other credibility problems pertaining to his methamphetamine usage, deals with the State, and other pending criminal matters. And for his part, Arce gave multiple conflicting stories to the police and only mentioned the "three of them to the face" for the first time at trial. Brown, who was also testifying under an immunity agreement, also told investigators different information than he provided at trial. Further, investigators never found a murder weapon, and the State presented no evidence of either Arroyo's or Hernandez' whereabouts between 4:18 and roughly 6:50 a.m., when a witness living a few miles away heard gunshots, shortly after which Hernandez' body was discovered.

14

However, the State presented strong circumstantial evidence that Arroyo was responsible for Hernandez' injuries and, ultimately, his death:

- S.B., Arce, and Brown all reported that Arroyo was angry with Hernandez because of a wrongfully converted truck, with Brown claiming that Arroyo had threatened to kill Hernandez over it.

- Arce testified that Arroyo pointed a 9-millimeter handgun at Hernandez' head while they were driving around; although this is not an uncommon caliber, ballistics evidence indicates that Hernandez was killed by a 9-millimeter.

- At trial, Arce also claimed that when he saw Arroyo afterwards, Arroyo said that Hernandez "took, like, three of them to the face" and was "gone."

- Only Arroyo expressed an interest in restraining Hernandez with rope or duct tape, and only Arroyo actually did tie Hernandez up, based on Armstrong's testimony.

- Arroyo's DNA profile could not be excluded from the samples taken from the rope that bound and lacerated Hernandez' wrists at the time of his death.

- Armstrong, the last testifying witness who saw Hernandez alive, reported that Hernandez was unhurt as of the time they reached Arroyo's parents' house, and did not testify that he saw Hernandez injured on the way back to his address afterwards—although Arroyo had covered Hernandez' head with a beanie at this time, which could have obscured injuries.

- Later on November 27, Arroyo asked Brown to get rid of Hernandez' car. And during his next visit, Arroyo admitted to Brown that he no longer drove the Avalanche "because the Avalanche had blood in it because he had to punch

15

somebody in the mouth." The blood discovered in the Avalanche was Hernandez' blood.

- Finally, every account presented, along with the video footage from Armstrong and Brown's residence, suggests that Arroyo was firmly in control of the night's proceedings and was generally directing others what to do next. The State presented evidence that Arroyo had both a rifle and a handgun in his possession that night.

When the Avalanche left the Brown-Armstrong address for the last time at 4:18 a.m., Hernandez and Arroyo were alone in it. While the record contains no evidence of what transpired between that point and—arguably—until approximately 6:50 a.m., the evidence paints a sufficiently clear trajectory of the night's events to permit the jury to extrapolate that the probable end result aligned with the State's theory of the case: Arroyo, who had motive, opportunity, and means, shot Hernandez four times in the back of the head after tying his hands behind his back. Cf. *State v. Pepper*, 317 Kan. 770, 779, 539 P.3d 203 (2023) ("even the gravest crime can be proved with circumstantial evidence and the logical inferences properly drawn from that evidence"); *State v. Douglas*, 313 Kan. 704, 716, 490 P.3d 34 (2021) ("strong circumstantial evidence" may render a prosecutorial error harmless). We readily conclude that the evidence supporting Arroyo's convictions, while circumstantial, was sufficiently overwhelming to render any combination of errors harmless.

Because we apply the same harmless error reversibility standard of K.S.A. 60-261 to Arroyo's undeveloped suggestion that cumulative error nevertheless warrants reversal, we reach the same conclusion. *State v. Williams*, 308 Kan. 1439, 1462-63, 430 P.3d 448 (2018). Although both assumed instructional errors related to the aggravated kidnapping conviction, it is even less likely that the jury would have found that Arroyo used *no* force in restraining Hernandez' liberty—as required for a criminal restraint conviction—than it

would have found that Arroyo used force, but did not in fact injure Hernandez, which would have supported a simple kidnapping conviction. Error in failing to give these two instructions could have compounded only if the jury found Arroyo used no force or threat in restraining liberty and inflicted no bodily injury. Considering the jury's conviction on first-degree felony murder, such findings would be inconsistent with the evidence.

The evidence supporting Arroyo's convictions, although circumstantial, was sufficiently overwhelming to render any combination of errors related to the lesser included offenses of aggravated kidnapping harmless. We thus affirm Arroyo's convictions and sentence.

Affirmed.

LUCKERT, J., not participating.