NOT DESIGNATED FOR PUBLICATION

No. 123,094

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN TERRY JORDAN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Barton District Court; CAREY L. HIPP, judge. Opinion filed November 5, 2021. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., CLINE, J., and BURGESS, S.J.

PER CURIAM: Steven Terry Jordan appeals his convictions for one count each of rape, aggravated burglary, and criminal damage to property. He argues he did not receive a fair trial below for several reasons: (1) the district court excluded relevant evidence integral to his theory of defense; (2) prosecutorial error for misstating the law during voir dire and making improper statements during closing arguments; and (3) the cumulative effect of these errors deprived him of a fair trial. Finding no reversible error, we affirm.

1

In July 2013, the State charged Jordan with one count each of rape, in violation of K.S.A. 2012 Supp. 21-5503(a)(1)(A), a severity level 1 person felony; aggravated burglary in violation of K.S.A. 2012 Supp. 21-5807(b), a severity level 5 person felony; and criminal damage to property in violation of K.S.A. 2012 Supp. 21-5813(a)(2) and (b)(3), a class B nonperson misdemeanor. The charges arose from a February 2013 incident in which A.W. reported a Black man, whom she later identified as Jordan, forced entry into her home and raped her. A jury convicted Jordan of all three charges in September 2015, and the district court sentenced him to serve 620 months in prison.

Jordan directly appealed, which resulted in a reversal of the convictions and a remand for a new trial. *State v. Jordan*, No. 116,669, 2018 WL 385695 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 991 (2018). At trial, Jordan claimed A.W. agreed to exchange consensual sex for drugs and money, but she became motivated to lie about what had occurred after Jordan backed out of the agreement. The panel concluded that the district court committed reversible error by excluding evidence of A.W.'s prior drug use and agreed with Jordan's argument that the evidence was integral to his theory of defense. 2018 WL 385695, at *10.

After the remand, and before the second trial, the State filed motions in limine regarding admission of evidence related to the Kansas rape shield law and A.W.'s prior drug use. The district court considered these motions at a pretrial hearing and ruled that the panel's decision required allowing "at least some" evidence of A.W.'s prior drug usage. Regarding evidence of A.W.'s prior sexual conduct, the court ruled that evidence would be allowed "specifically to rebut any proof that the State will bring, and the issue is really whether or not there was sex within the previous 72 hours." As support for this ruling, the court relied on *State v. Perez*, 26 Kan. App. 2d 777, 781, 995 P.2d 372 (1999) (discussing factors to consider when deciding whether prior sexual conduct of a

complaining witness has relevance), *rev. denied* 269 Kan. 939 (2000). The court noted it would specifically allow A.W.'s friend and former sexual partner, B.R., to testify about "sex within the preceding 72 hours," but would revisit the ruling for evidence "any broader than what we have already discussed."

*The prosecutor refers to the burden of proof during voir dire.*

The trial began in December 2019. During voir dire, the prosecutor discussed the State's burden of proof several times, first informing the potential jurors that "[t]he State carries the burden of proof in a criminal justice system, and that burden is quite high. It's beyond a reasonable doubt." Later, the prosecutor stated:

> "The standard of proof in this case is beyond a reasonable doubt, and that means what it sounds like. I can't give you a definition. It's something that's reasonable. My youngest daughter has a tendency to snitch things in terms of food. You know, here recently we come home, there's a frozen pizza in the oven, and she's the only one home. Circumstantially, we should be able to infer that she was the person who made the frozen pizza. Despite the fact that we assure her she's not in trouble, we ask about the pizza. She doesn't know who put that pizza in. Now she plans on eating a piece of that pizza, but she didn't put it in. Maybe the dog put that pizza in, but that's probably not a reasonable explanation. It's the things that are reasonable. Okay. Everybody kind of have that concept? It's not that there isn't some other potential explanation. You know, somebody broke into our house, decided they were hungry, were startled when they realized she was there and left before, and she just happens to discover a pizza in the oven. Okay. Maybe it happened. Probably not very reasonable under the circumstances, but I guess it's possible. That's what we're thinking of when we talk about beyond a reasonable doubt, that there's no other reasonable explanation as to the set of facts."

3

*A.W. testifies at trial.*

A.W. testified that she lived alone in her home in February 2013 and was about three months pregnant at the time. On February 5, she returned home from work around 11 or 11:30 p.m. with her cousins. She talked with her cousins for about an hour until they left and then she prepared for bed. After A.W. turned the lights off and locked the front door, she laid down in her bed. Before falling asleep, A.W. heard footsteps on the front porch. She got out of bed to turn on the light and find her phone so she could call 911. While dialing, A.W. heard banging on the front door like someone was trying to get inside. After about four or five bangs, she heard the door open. Shortly after the 911 call connected, A.W. saw a Black man wearing a hoodie and holding a knife enter her bedroom, and she quickly hung up the phone.

A.W. said the man asked if she was calling 911, so she lied and said no because she was scared. The man told her to get on the bed, and A.W. again complied out of fear. The man then got on top of her and began putting his hand up her shirt, meanwhile laying the knife by her head. The man took his pants off and penetrated A.W.'s vagina with his penis. A.W. could not recall how long the assault occurred or if he ejaculated. She remembered pleading with the man "'don't hurt me,'" but he did not respond. A.W. testified that at no point did she consent to sexual intercourse with the man. She also denied having consumed any alcohol or drugs in the three days before the assault, nor did she agree to exchange sex for drugs or money. However, she admitted using meth "once or twice years and years before that, but that was it."

When the man was finished, he covered A.W.'s face with a blanket and told her "'don't look at my face.'" A.W. laid in her bed and heard the man's footsteps leave the bedroom. Once A.W. heard footsteps on the front porch, she jumped out of bed and found her phone to call 911 again. She got her purse and dog and went outside to a truck, locking herself inside and called 911. A.W. told the dispatcher on the call that "some

4

Black guy with a big knife just kicked in my front door," came into her bedroom, told her to put her phone down, and raped her. The dispatcher asked her if she knew who the man was, and A.W. responded, "No, I don't."

After the police arrived, A.W. was transported by ambulance to the hospital. Once there, medical personnel performed a DNA test and a pelvic exam on A.W. After leaving the hospital, A.W. went home with her father. Later in the day, A.W. went back to her house to move out. While there, two of her neighbors came by to talk. A.W. told them what had happened and that her assailant was a Black male, and one of the neighbors mentioned the name "Dewey." At one point, a detective also came over to speak with A.W. and presented her with photos to identify the assailant. A.W. identified her attacker on the photo line-up and gave the detective the name "Dewey." At trial, A.W. identified Jordan as "[t]he person that broke into the house."

A.W. testified that she was in a physical relationship with B.R. "awhile before" the incident. She said she had not seen B.R. for "[p]robably a good three weeks" leading up to the incident. On cross-examination, A.W. explained that she believed B.R. was the father of the child she was carrying at the time of the incident.

*Officers respond to the 911 call and investigate.*

Around 1:58 a.m., a 911 call was reported over dispatch that a Black male had broken down a door and was armed with a knife. Corporal Joseph Johns responded to this call and was the first to arrive at the scene. Upon arrival he contacted A.W., who was still locked inside the truck. At first, A.W. did not want to speak with Corporal Johns and appeared to be scared. Eventually, she told him that "an unknown [B]lack male had kicked in her front door and forced . . . her to the back bedroom with a knife and raped her." A.W. described the man as approximately six feet tall and wearing black sweatpants

5

and a hoodie. Corporal Johns testified A.W. did not appear to be under the influence of alcohol or methamphetamine.

Officer Adam Hales responded to the 911 call as well. When he arrived at the address, Corporal Johns had already arrived, and A.W. was exiting the truck. As Hales approached, he saw that A.W. was hugging her stomach with her hands and bent over slightly. She was very upset and was crying. Hales could not recall if A.W. gave a height or weight, but she described her attacker as a Black male wearing a grey hoodie and black sweatpants. After helping other officers secure the scene, Hales followed the ambulance transporting A.W. to the hospital.

At the hospital, Officer Hales interviewed A.W. He described A.W.'s demeanor as "a shocked state" and "[a]lmost in a daze . . . [or] detached." Hales did not believe A.W. was under the influence of alcohol or methamphetamine. Hales said A.W. told him that after her cousin left around 1:30 a.m., she shut off the lights and laid down in bed. About 10 minutes later, she heard footsteps on the front porch and a loud banging that sounded like someone was trying to break down the door. She got out of bed to look and saw the front door moving forward violently, as if someone's body was being thrown against it.

Hales said A.W. stated she retreated into her bedroom to grab her phone and dialed 911. When she looked back to the doorway, she saw a Black male subject wearing a grey hoodie entering the bedroom. He was trying to pull the hood down to hide his face and was holding a knife. The man asked A.W. if she was calling 911, so she lied and said no because she was scared he would hurt her. The man walked over, grabbed the phone, and ended the call to dispatch. He forced her onto the bed and buried his head into her right shoulder and placed the knife over her head. The man began kissing her and pulled down her pants. He then pulled down his pants and raped her for about 10 minutes. As the man raped A.W., he asked her, "'you like that baby?" A.W. told him no and pleaded for him to get off her and not to hurt her. The man ignored her and eventually stopped,

6

but she was not sure if he had an orgasm or not. The man got up and placed a blanket over her head.

A.W. told Hales the man pulled his pants back on and began walking around the house. A.W. just laid there, but she could hear him walking around the house in and out of the bedroom. At one point, the man asked about a red rag, but A.W. did not know what he was talking about. He also asked about some property she had. The man asked if she was going to call the cops, and A.W. said no because she was scared he would kill her. After about 10 or 15 minutes of lying there, A.W. got up and got dressed. She grabbed her purse and went outside and locked herself in her truck and called 911.

Officer Hales had A.W. complete a written statement based on her verbal statements. In the written statement, A.W. explained:

> "It was around 1:30 a.m. this morning that my cousin left my house. Right after he left I shut all my lights off and went and layed [*sic*] down. Not even 10 mins. later from laying down I heard footsteps on my front porch and a big bang like someone was breaking down my door[.] I heard the bang 4 times. I went to grab my phone[.] I dialed 911 [and] that is when he was walking into my bedroom. He asked me if I was calling 911[,] I said no. I seen he had a knife in his hand, I asked him please don't hurt me. He was a [B]lack male. He then got on top of me. He said it felt good. I was scared the whole time. He said he wasn't going to hurt me. When he got off of me he took the blankets [and] covered my face with them [and] said don't look at my face[.] He walked in [and] out of bedroom like 3 different times looking for a rag he had. He had a rag he found it on my bed. After that that is when he had left. I then got up[,] grabbed my shoes [and] my purse [and] went out backdoor [and] got in my cousin's vehicle [and] called 911. He also asked if I had any money[,] I told him no."

Detective Heather Smith met with A.W. the day after the incident. A.W. told Smith she did not know the man and had never seen him, only giving a general description that he was a Black man. A.W. provided the detective with the name Dewey,

7

which was provided by the neighbor. Based on that information, Smith identified Jordan as a suspect and produced a photo line-up.

Debra Higgins performed the SANE/SART examination on A.W. the morning of the incident. When Higgins began the exam, A.W. seemed anxious. A.W. was crying at times and did not make a lot of eye contact, instead looking down at her hands. A.W. told Higgins that she was laying in her bed around 1:30 a.m. and heard a loud banging on her door. She got out of bed to find her cell phone and attempted to call 911. By that point, the man was already in her bedroom. He pushed A.W. onto the bed, pulled down her pants, and started having sex with her. A.W. tried to push him off and asked him not to hurt her, to which the man moved a knife up towards her head. When the man was finished, he placed blankets over her face. When A.W. felt safe to get up, she put her clothes back on, found her cell phone, and went outside to call 911. A.W. said she had not showered or changed clothes since the incident. A.W. reported that she was 11 weeks pregnant at the time.

During the physical examination, Higgins noticed an area of discoloration on A.W.'s left inner thigh and some injury in her genital area. Higgins observed tenderness and redness to both sides of the labia majora and a small abrasion with some discoloration. The abrasion was very recent. According to Higgins, it was possible that these injuries were a result of consensual sex. Higgins could not perform a speculum exam because of the tenderness. However, Higgins performed a vaginal swab for DNA. She also collected A.W.'s clothing, including her underwear and sweatpants.

Two KBI forensic analysts, who tested fingerprints from A.W.'s phone and the DNA samples taken during the SANE/SART exam, testified as well. No identifiable prints could be found on the phone. The DNA analysis revealed seminal fluid collected from the rape kit consistent with Jordan's DNA.

8

*B.R. testifies on behalf of the defense.*

B.R. testified that he met A.W. in September or October 2011 and that he and A.W. "had a physical relationship, a drug relationship, all around." According to B.R., the relationship was "mostly using and having sex." He did not consider himself A.W.'s boyfriend. B.R. said the first night he met A.W. they went to her house and got high and had sex. This occurred every other day going forward as well. He found out A.W. was pregnant the day of the incident, and she led him to believe that he was the father. After the child was born, B.R. took a paternity test that confirmed he was not the father.

According to B.R., A.W. told him that a Black man broke into her home and raped her, but she did not know who it was. B.R. said he had sex with A.W. a couple of days before the incident. B.R. said they had "[f]orceful" or "aggressive" sex and that his penis was pierced. He said he and A.W. used "a gram or more" of meth on the night of their last sexual encounter two days before the incident involving Jordan.

On cross-examination, B.R. testified that Jordan was "like family." B.R. said he spoke with Jordan's nephew several months after the incident, and during the conversation, the nephew asked B.R. what his thoughts were. As B.R. began to respond, defense counsel objected as to relevance, which the court overruled based on the prosecutor's explanation that "it's to the motivation [of] his testimony here." The following exchange occurred:

"Q. [Prosecutor] What were your thoughts?
"A. [B.R.] You want the truth?
"Q. The truth.
"A. I didn't think he did it because she's traded me sex for drugs before.
"Q. Objection.
"A. You asked for the truth.

9

"THE COURT: All right. Sir, you have to stop and wait for a question to be asked, and then you answer that question, okay?

"A. But I'm answering. He asked me what I thought. I'm telling you exactly what I thought.

"Q. [Prosecutor] I asked what your response was.

"A. You asked what I was thinking when that conversation was come up.

"[Prosecutor]: I'll withdraw, Your Honor. I don't have any other questions for [B.R.].

"THE COURT: All right. Question withdrawn."

On redirect, defense counsel asked if B.R. could remember his response when speaking with Jordan's nephew about the incident. B.R. responded, "Like I said, I didn't think he did it." Then, the following exchange occurred:

"Q. [Defense counsel] Okay, and why didn't you think he did it?

"[Prosecutor]: Objection pursuant to 60-447, specific instances of conduct cannot be used to attack someone's character or proof for other content.

"[Defense counsel]: Your Honor, this isn't to character. This is his opinion, and he asked him his opinion. I believe I'm entitled to ask him why.

"THE COURT: I agree. Overruled.

"A. [B.R.] This is why. Because like I said before, I met her while using drugs. I traded her. I got her high to have sex. The defendant has never had an issue with getting a woman to sleep with him.

"[Prosecutor]: Objection.

"A. [B.R.]: And I know this.

"[Prosecutor]: Relevance.

"THE COURT: You have to stop, sir.

"[Prosecutor]: Relevance. It's not responsive to the question.

"THE COURT: I agree, and I will sustain that objection.

"[Defense counsel]: I think that's all the questions I have. Thank you.

"THE COURT: Thank you."

10

*Jordan testifies at trial.*

Jordan testified on his own behalf. According to Jordan, on the night of the incident he went outside to smoke a cigarette around 11:45 p.m. or 12:15 a.m., although he could not recall the exact time. He also had trouble remembering things that happened because he was under the influence of methamphetamine that night. Jordan saw A.W. on her porch smoking a cigarette, so he went over there to see if B.R. was there. B.R. was a friend of Jordan's, and he had seen B.R. at A.W.'s house a couple of times. Jordan said he had met A.W. two or three times before at the gas station where she worked.

Jordan testified that he went to A.W.'s house to see where B.R. was or see what he was doing. When he asked A.W. if B.R. was there, she said no. He then asked if she smoked and got high, to which A.W. responded "yeah." A.W. then invited Jordan inside. Once inside, Jordan sat on A.W.'s bed and asked if she would like to smoke with him and she agreed. Jordan said he told A.W. he would give her $50 worth of meth and $20 worth of dope to have sex, and she said yes.

Jordan said he got the meth out of his wallet and smoked it with A.W. He and A.W. then had sex for about five minutes. Jordan described A.W. as "easy." A.W. did not appear to be sore or irritated during the sexual intercourse and never conveyed that it hurt. After that, Jordan got up because he knew he did not have the money to pay her and because he was thinking about B.R. Jordan did not want B.R. to be angry at him, so he got up and walked out the door without saying anything. After he got about 20 or 30 feet away from the house, Jordan realized he left his wallet inside. A.W. had shut the door and Jordan said it was "loose," so he pushed it in with his hand and went to grab his wallet from the side of A.W.'s bed. According to Jordan, she then asked him if he was going to tell B.R. Jordan

11

responded that he would. A.W. said nothing but seemed upset based on "[h]er face impression."

*The parties make closing statements.*

After both parties rested and the jury instructions were finalized, the attorneys began their closing statements. Near the beginning of his statements, the prosecutor explained:

> "You have heard certain witnesses throughout the course of this trial say I believe. It's my opinion. Their opinion is not relevant. My opinion is not relevant. Ms. Crane's opinion is not relevant. The only relevant opinion as to the decision in this case is you, the jurors, in this situation."

The prosecutor also referenced "the common sense instruction," which

> "says it is for you to determine the weight and credit to be given to the testimony of each witness. You have a right to use common knowledge and experience in regards to the matter upon which a witness has testified. That's the common sense instruction, ladies and gentlemen. You don't get to check your life experiences at the door. I sometimes call that you get to use your BS meter in terms of weighing, you know, who's being accurate, who has presented the most accurate and most reasonable, the only reasonable explanation of these facts."

In addition, when discussing the "Who," the prosecutor explained it would refer to A.W. as a "victim." Later, the prosecutor remarked that "[t]hey did a SANE/SART exam on this young lady, an exam that I will tell you has to be one of the most invasive procedures you could ever have. It's not something that you voluntarily go in and do." The prosecutor also discussed the location of the incident, explaining:

12

"It was [A.W.]'s home. That's one of the elements that you're going to have to consider that, you know, how was this property used. Somebody lived there. Somebody's dwelling in it. It was someplace where somebody should feel safe. What happened as a result of this? She no longer felt safe in that residence. Ladies and gentlemen, we submit to you, after that exam, what did she do? Every witness was consistent including the defense witness that came here but that would live across the street. She moved out. She didn't stay in that place, you know. She didn't feel safe there."

Later, when discussing the "Why," the prosecutor told the jury to

"[l]ook at the physical evidence here, ladies and gentlemen. She had trauma to her genital areas. They tried to present [B.R.] again—Mr. Wonderful [B.R.], well, you know, I'm a stud and I had sex with her for two hours and tied her up and it was aggressive and my pierced penis, 48 hours earlier, and I was with another woman the night that [A.W.] was assaulted and she told me she was assaulted, but you know, that's what caused that."

During rebuttal, the prosecutor responded to defense counsel's remarks about A.W.'s "motive" to fabricate the allegations, remarking:

"What is the motive for [A.W.] to tell the police to tell you the trier of fact that I was sexually assaulted in my own home? They would like you to believe that that was done so that her boyfriend, [B.R.], wouldn't find out about it. Did she minimize her connection to [B.R.]? You be the judge. You know, he's quite a peach. You really want to be connected to that guy. In [B.R.'s] word[s]—what was your relationship with [A.W.]? He looked at her as someone I had sex with. That's all it was. There was nothing else to it. Some place I could crash. A woman I could use."

Later, the prosecutor remarked that the defense sought to "bolster" Jordan's version of the events with B.R.'s testimony, referring to B.R. as "the stud with the pierced penis . . . who quickly let us know very quickly in my opinion that [Jordan] didn't do it. He wouldn't have to . . . pay somebody for sex."

13

Lastly, the prosecutor closed by going back to "the Who." The prosecutor stated:

> "You know, sometimes we see in these defenses let's blame the police, crappy police work, let's blame the victim. In this instance, they're trying to point you as evil as she could be, and I'm going to leave with you kind of a scenario to think about.
>
> "When I was in college, I had a very dear friend of mine who she was HIV positive. And back in the '90's the question was how did you acquire it. And her response consistently was you think of the worst case scenario of how you could acquire this disease, because in the end it doesn't matter."

*The case is submitted to the jury.*

During deliberations, the jury asked whether a toxicology report or blood draw was taken the night of the incident. By agreement of the parties, the district court referred the jury back to Instruction No. 1, which advised, "Please refer to Instruction Number 1. Any decision reached by the jury must be based off of the evidence submitted to the jury."

The jury returned a guilty verdict on all three charges. The district court later sentenced Jordan to 272 months in prison on the rape charge, 32 months in prison on the aggravated burglary charge, and 6 months in jail on the criminal damage to property charge. The court ran Count 2 consecutive to Count 1 but ran Count 3 concurrently for a total controlling sentence of 304 months with lifetime postrelease supervision.

Jordan timely appealed.

I.   *The district court did not err by excluding relevant evidence.*

Jordan first argues that the district court violated his constitutional right to a fair trial by excluding relevant evidence integral to his theory of defense. When reviewing whether a district court violated a defendant's right to present their theory of defense on appeal, this court applies a multistep analysis to the district court's decision whether to admit or exclude evidence.

> "[T]he first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. Review of whether a trial court erroneously excluded evidence that is integral to the defendant's theory of his or her defense is de novo.

> "Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case. Probative evidence requires only a logical connection between the asserted fact and the inference it is intended to establish.
> . . . .
> "A criminal defendant has the right, under both the Kansas and United States Constitutions, to present the theory of his or her defense, and the exclusion of evidence that is an integral part of that theory violates the defendant's fundamental right to a fair trial. In order to constitute error, the excluded evidence supporting the defense theory must be relevant, admissible, and noncumulative. A defendant's right to present evidence in support of a defense is subject to certain restraints: the evidence must be relevant, and evidentiary rules governing admission and exclusion of evidence are applied. [Citations omitted.]" *State v. Robinson*, 306 Kan. 431, 435-36, 394 P.3d 868 (2017).

To convict Jordan of rape, the State needed to prove that he engaged in nonconsensual sexual intercourse with A.W. when she was overcome by force or fear. K.S.A. 2012 Supp. 21-5503(a)(1)(A). Likewise, the State charged Jordan with aggravated burglary, which required proof that he knowingly entered A.W.'s residence without permission and with the intent to commit a felony—i.e., the rape—when one or more

15

persons was present. See K.S.A. 2012 Supp. 21-5807(b). Lastly, the State charged Jordan with criminal damage to property, which required proof that he unlawfully and knowingly damaged the front door, door jam, and lock of the property and caused less than $1,000 in damage. K.S.A. 2012 Supp. 21-5813(a)(2) and (b)(3).

The parties agree that the main dispute comes down to whether the sexual intercourse was consensual. As in the first appeal, Jordan's theory of defense was that A.W. agreed to have consensual sex with him in exchange for drugs and money but became motivated to lie after he went back on this arrangement. He contends that the district court's exclusion of evidence showing A.W. exchanged sexual favors with B.R. for drugs prevented him from further establishing her drug addiction, which in turn suggests she engaged in the same conduct with Jordan.

Jordan's evidentiary challenge stems from a specific ruling by the district court sustaining the State's objection to testimony offered during defense counsel's redirect examination of B.R.

On cross-examination, the prosecutor asked B.R. about a conversation he had with Jordan's nephew months after the incident, during which the nephew asked B.R. "[w]hat were [his] thoughts." Defense counsel objected as to relevance, and the prosecutor responded the question went "to the motivation [for B.R.'s] testimony." The district court overruled this objection and directed B.R. to answer the question. When B.R. answered that he "didn't think [Jordan] did it because [A.W.] traded me sex for drugs before," the prosecutor lodged an unspecified objection. After B.R. explained that he was truthfully answering the question of "what I was thinking when that conversation [had] come up," the prosecutor said, "I'll withdraw, Your Honor. I don't have any other questions for [B.R.]." The court then stated, "All right. Question withdrawn."

16

Jordan specifically points to B.R.'s testimony on redirect, and is now claiming the district court improperly excluded the testimony. The transcript shows that defense counsel asked B.R. on redirect about his response to the nephew's question, to which B.R. explained, "Like I said, I didn't think he did it." When defense counsel further inquired "why didn't you think he did it," the prosecutor objected because "pursuant to [K.S.A.] 60-447, specific instances of conduct cannot be used to attack someone's character or proof for other content." Defense counsel responded, "this isn't to character. This is his opinion, and he asked him his opinion. I believe I'm entitled to ask him why." The district court agreed and stated the objection was overruled. B.R. then answered, stating, "[t]his is why. Because like I said before, I met [A.W.] while using drugs. I traded her. I got her high to have sex. The defendant has never had an issue with getting a woman to sleep with him." The prosecutor again objected for relevance and for being nonresponsive, and the district court stated, "I agree, and I will sustain that objection."

*The district court did not exclude B.R.'s testimony that he exchanged drugs for sexual favors with A.W.*

The State correctly asserts the record does not establish that B.R.'s testimony was excluded. On cross-examination, the prosecutor asked what B.R.'s thoughts were. Defense counsel objected to the question, but the objection was overruled. B.R. answered the question by stating, "I didn't think he did it because [A.W.] traded me sex for drugs." The prosecutor made an unspecified objection to the answer to his question. After some interplay between the judge, the prosecutor, and the witness, the prosecutor essentially abandoned the issue by stating, "I withdraw."

It is unclear from the record what the prosecutor meant when he stated, "I withdraw." The judge presumed that the prosecutor withdrew the question, which resulted in the contested answer by B.R. Regardless, there is nothing in the record to show that the judge issued an admonishment to the jury to disregard B.R.'s answer. There

17

is nothing in the record to show that either party requested the court to give such an admonishment. Clearly B.R.'s answer was before the jury for their consideration, and the parties seem to agree that B.R.'s cross-examination response was never excluded.

Jordan argues that the district court erred when it excluded similar evidence that was elicited on questioning by defense counsel on redirect. Counsel asked B.R., "Okay, and why didn't you think he did it?" The prosecutor objected to the question, defense counsel responded, and the judge overruled the objection. B.R. answered, "[t]his is why. Because like I said before, I met [A.W.] while using drugs, I traded her. I got her high to have sex. The defendant has never had an issue with getting a woman to sleep with him." The prosecutor objected on the grounds of relevance, and the judge sustained the objection.

Jordan's argument assumes that when the district court sustained the relevance objection, it excluded all of B.R.'s answer including the statement that the victim and B.R. had previously traded sex for drugs. A reading of the record suggests otherwise.

In answering defense counsel's question, B.R. offered his statement concerning trading sex for drugs with the defendant. That testimony had previously been given, and the prosecutor had failed to secure a ruling from the court in objecting to the testimony. B.R.'s statement was already in front of the jury, there was no reason for the prosecutor to object to the testimony being given a second time, and the prosecutor did not raise an objection when B.R. made the statement. It was only after B.R. made the gratuitous statement concerning Jordan's success in having women sleep with him that the prosecutor lodged the relevance objection. That statement was clearly irrelevant, and the district court was correct in sustaining the objection. Additionally, the court never gave, and neither party requested that the court give, the jury an admonishment to disregard B.R.'s testimony.

18

Jordan argues that an important part of his defense was showing that A.W. previously used drugs and traded sex for drugs. Jordan got that opportunity. B.R. testified concerning A.W.'s drug use. In response to a question asked by the prosecutor and a question by defense counsel, B.R. testified that A.W. had a propensity to trade sex for drugs. Both parties discussed B.R.'s testimony and A.W.'s drug use in closing arguments. Jordan was not denied an opportunity to present his defense. The evidence which he claims established his defense was never excluded. It was before the jury to consider against all the other evidence presented and to give it whatever credibility it believed the evidence merited.

II.     *The prosecutor did not err by making improper statements.*

Jordan next makes several claims that the State made improper statements of law and fact during voir dire and closing arguments. He argues the prosecutor erred by: (1) defining beyond a reasonable doubt during voir dire and closing arguments as having no other reasonable explanation; (2) informing the jury that the witnesses' opinions were not relevant; (3) portraying A.W. as a "victim" based on the hardships she endured and inflaming the passions of the jury; and (4) making sarcastic remarks and offering a personal opinion about B.R.'s credibility.

The State disagrees with Jordan's characterization of these comments as improper and asserts mainly that these instances are taken out of context. Alternatively, the State argues any error for making these comments is harmless because the jury instructions properly informed the jury to disregard statements not supported by evidence and because the evidence of Jordan's guilt is overwhelming.

19

*Standard of review*

As both parties recognize, the Kansas Supreme Court considers this type of claim under the term "prosecutorial error." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"To determine whether prosecutorial error has occurred, [this] court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, [this] court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, this court simply adopts the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

See also *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *Sherman*, 305 Kan. at 109.

Although Jordan did not object to any of the prosecutor's statements at trial, that does not preclude review by this court. Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018). Moreover, a misstatement of controlling law must be

20

reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is deliberately made, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see also *State v. Magallanez*, 290 Kan. 906, 915, 235 P.3d 460 (2010) (misrepresentation of burden of proof in closing argument).

*The prosecutor did not err when it explained reasonable doubt.*

The Kansas Supreme Court has held that efforts to define reasonable doubt amount to error when they lead to a misstatement of law. *State v. Garcia-Garcia*, 309 Kan. 801, 815, 441 P.3d 52 (2019). As an example, a prosecutor's remark that "'[r]easonable doubt means if you are going to say these men are not guilty of something, you have to give a reason for it'" constituted error because it implied that a jury must find the defendant guilty unless it could articulate a reason for acquittal. *State v. Banks*, 260 Kan. 918, 927, 927 P.2d 456 (1996); see also *State v. Walker*, 276 Kan. 939, 955-56, 80 P.3d 1132 (2003) (Finding error where district court instructed the jury "'that a reasonable doubt is just what the words themselves imply—a doubt founded on reason. *It is such a doubt as a juror is able to give a reason for*.'") (citing *Banks*, 260 Kan. at 927). Likewise, a prosecutor's remark during closing argument defining reasonable doubt as "'common sense'" would be improper because that definition leads the jury to believe it can convict by using a lesser burden of proof. *State v. Mitchell*, 269 Kan. 349, 361, 7 P.3d 1135 (2000).

In *Garcia-Garcia*, the defendant challenged the prosecutor's explanation during voir dire that reasonable doubt was "'kind of a two-part test. First you have to determine if you have any doubt . . . . And then you have to determine if that doubt is reasonable.'" 309 Kan. at 814. The Kansas Supreme Court found no error in this statement because it "merely echoed . . . [i.e.] did not alter or lower the State's burden," a conclusion that was "reinforced by the prosecutor's statements immediately following the complained-of

21

remark that correctly characterized the State's burden and emphasized the prosecutor could not define it for the jury." 309 Kan. at 817.

Here, Jordan contends the prosecutor misstated the law like in *Banks* and *Walker* by defining reasonable doubt in terms of being "the most reasonable explanation" of the facts. In particular, he points first to a hypothetical scenario offered during voir dire to the prospective jurors about the prosecutor finding his young daughter at home alone with a frozen pizza in the oven. The prosecutor explained:

> "Maybe the dog put that pizza in, but that's probably not a reasonable explanation. It's the things that are reasonable. Okay. Everybody kind of have that concept? It's not that there isn't some other potential explanation. You know, somebody broke into our house, decided they were hungry, were startled when they realized she was there and left before, and she just happens to discover a pizza in the oven. Okay. Maybe it happened. Probably not very reasonable under the circumstances, but I guess it's possible. That's what we're thinking of when we talk about beyond a reasonable doubt, *that there's no other reasonable explanation as to the set of facts*." (Emphasis added.)

Then during closing arguments, the prosecutor was discussing the jury's ability to use "common sense" in considering the evidence offered and concluded that point by stating, "I sometimes call that you get to use your BS meter in terms of weighing, you know, who's being accurate, who has presented the *most accurate and most reasonable, the only reasonable explanation of these facts*." (Emphasis added.)

This case is similar to the recent decision in *State v. Kanatzar*, No. 119,399, 2020 WL 593965 (Kan. App. 2020) (unpublished opinion), *rev. denied* 313 Kan. 1044 (2021). In that case, the prosecutor asked the prospective jurors during voir dire if they could have doubt and still find the defendant guilty. Some jurors responded that they would want to have personally witnessed an act to be convinced beyond all doubt, to which the prosecutor asked if anyone knew why he could not give them what they wanted. One

22

juror replied: "'If you see the crime, you're going to be a witness and can't be on the jury." The prosecutor agreed and explained that "'[t]hat's why the standard isn't beyond all doubt. That's why it is beyond a reasonable doubt. So you can have doubt and still find a person guilty.'" 2020 WL 593965, at *9. The panel concluded the prosecutor's statements were not error because they "merely distinguished beyond a reasonable doubt from beyond all doubt." 2020 WL 593965, at *10 (citing *Garcia-Garcia*, 309 Kan. at 814).

As the State correctly notes, the prosecutor's comments here were more like the statements in *Garcia-Garcia* because the prosecutor was accurately explaining the difference between beyond all doubt and beyond a reasonable doubt. By explaining to the jury that the evidence must support a reasonable explanation of the facts, the prosecutor accurately explained how to apply the State's burden to both theories of the case. In other words, the jury could have doubt of the State's theory of the case based on Jordan's defense, but still find him guilty because that doubt was not reasonable. There is no error as to this issue.

*The prosecutor erred by informing the jury that witness opinions were not relevant.*

On this point, Jordan asserts the prosecutor misstated the law when it opened its closing statements by explaining:

> "You have heard certain witnesses throughout the course of this trial say I believe. It's my opinion. *Their opinion is not relevant*. My opinion is not relevant. Ms. Crane's opinion is not relevant. The only relevant opinion as to the decision in this case is you, the jurors, in this situation." (Emphasis added.)

Jordan contends this is a misstatement of law because K.S.A. 60-401(a) provides that "'Evidence' is the means from which inferences may be drawn as a basis of proof in

23

duly constituted judicial or fact-finding tribunals, and includes *testimony in the form of opinion*, and hearsay." (Emphasis added.) The State recognizes that the prosecutor's comment is "problematic," but still contends it does not amount to error because the prosecutor "seems to be" informing the jury to decide the verdict based on the facts. The State's argument is unpersuasive because the prosecutor's statement directly contradicts K.S.A. 60-401(a). As Jordan explains, the prosecutor's statement is especially concerning, given that B.R.'s opinion about A.W.'s allegations featured prominently in Jordan's defense. The prosecutor erred by informing the jury that witness opinions were not relevant.

*The prosecutor did not err by calling A.W. a victim or remarking on the defense strategy but did err by inflaming the passions of the jury.*

Jordan next claims the prosecutor erred by calling A.W. a "victim" four times during closing arguments and structuring its argument to inflame the passions of the jury. The prosecutor described the sexual assault exam as "an exam that I will tell you has to be one of the most invasive procedures you could ever have. It's not something that you voluntarily go in and do." The prosecutor then described how A.W. moved out of the residence where the rape occurred because she "no longer felt safe." Finally, Jordan points out how the prosecutor commented on defense counsel's strategy to "blame . . . the crappy police work [and] blame the victim. In this instance they're trying to point you as evil as she could be."

As support for his claim that the prosecutor improperly inflamed the passions of the jury, Jordan relies on *State v. Adams*, 292 Kan. 60, 67, 253 P.3d 5 (2011), in which the Kansas Supreme Court held, "[A] prosecutor crosses the line of appropriate argument when that argument is intended to inflame the jury's passions or prejudices or when the argument diverts the jury's attention from its duty to decide the case on the evidence and controlling law." In reaching that conclusion, our Supreme Court recognized that asking the jury to base its deliberations on sympathy for the victim or their family or otherwise

24

argue the impact of a crime on the victim or their family amounts to prosecutorial misconduct. 292 Kan. at 67-68. More recently, the Kansas Supreme Court reaffirmed this holding after *Sherman* updated the terminology for prosecutorial misconduct claims to prosecutorial error. See *State v. Nesbitt*, 308 Kan. 45, 56-57, 417 P.3d 1058 (2018) (finding error in prosecutor's comments referring to 100-year-old murder victim as a "gift" or "treasure" to her family).

Regarding the prosecutor's use of the term "victim," we find no error. As the State points out, Jordan provides no authority—nor does there appear to be any—where a Kansas court has found that merely calling the complaining witness a victim amounted to an improper statement. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (failing to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is like failing to brief the issue).

Likewise, there is no error in the prosecutor's remarks on the defense strategy. As the State points out, the prosecutor's comments rebutted portions of defense counsel's arguments, which Kansas courts have routinely found not to be error in similar cases. See *State v. Miller*, 293 Kan. 535, 552, 264 P.3d 461 (2011); *State v. Sinzogan*, 53 Kan. App. 2d 324, 331, 388 P.3d 176 (2017) (no error where "the prosecutor was clearly commenting on defense counsel's trial tactics and closing argument, not trying to diminish the role of defense attorneys"). Here, defense counsel's closing argument focused heavily on whether A.W. was telling the truth and questioning the investigation conducted by the police in the case. The prosecutor's remarks in response to the defense arguments were not error.

As for the prosecutor's remarks on the sexual assault exam and the fact that A.W. no longer felt safe in her home, those comments amounted to prosecutorial error. The State contends the prosecutor's comments on the sexual assault exam were not designed to inflame the passions of the jury because calling the exam "invasive" is an accurate

description based on the evidence that was presented. The State asserts these comments were fair inferences based on the evidence that demonstrated A.W.'s credibility. However, the State did not merely recite the evidence in its closing argument but emphasized that A.W. would not have "voluntarily" undergone the procedure. This statement can be fairly characterized as designed to inflame the passions of the jury by shifting their focus away from Jordan's guilt towards what A.W. had to endure because of the incident. The same is true, to an even greater extent, for the comments about A.W. no longer feeling safe in her home. The prosecutor erred when making these comments because they improperly diverted the jury's attention from the evidence and sought to inflame the passions of the jury.

*The prosecutor did not err by making sarcastic remarks but did err by offering an opinion on B.R.'s credibility.*

Lastly, Jordan contends the prosecutor erred by sarcastically commenting on B.R.'s credibility by calling him "Mr. Wonderful [B.R.]," a "stud," and "quite a peach." Jordan also points out that the prosecutor stated that B.R. "quickly let us know very quickly in my opinion that [Jordan] didn't do it. He wouldn't have to . . . pay somebody for sex."

As support, Jordan notes that the Kansas Supreme Court has cautioned that sarcasm "cannot be used in ways that distract the jury from its charge, demean the adversarial trial process, or become unprofessional to the point of jeopardizing a verdict." *State v. Longoria*, 301 Kan. 489, 526, 343 P.3d 1128 (2015). In addition, our Supreme Court noted that "the line between appropriate and inappropriate sarcasm is thin," and that sarcasm "should be thoughtfully tailored to specific arguments and evidence [and] should not set the tone of the prosecutor's entire argument or rebuttal." 301 Kan. at 526. Finally, Jordan asserts that the prosecutor improperly commented that he did not believe B.R. was credible. *State v. King*, 308 Kan. 16, 30-31, 417 P.3d 1073 (2018) (disapproving of comments by prosecutor on their personal opinion of a witness'

26

credibility "because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case").

The prosecutor's remarks about B.R. did not cross the line to inappropriate sarcasm. The prosecutor's sarcastic remarks during closing arguments did not "set the tone" of the entire argument but were merely a small portion of refuting whether B.R. provided credible testimony. The prosecutor continually discussed specific pieces of evidence that supported the State's theory of the case, only briefly using sarcasm to highlight B.R.'s testimony to show the weakness of that aspect of the defense's argument.

The prosecutor did err by stating his personal opinion as to part of B.R.'s testimony. The State attempts to downplay the prosecutor's statement by asserting he was actually saying that B.R. quickly offered his own opinion, and not that the prosecutor was offering his own opinion. The fact is that describing B.R.'s testimony as being offered "quickly" is an impermissible opinion because the prosecutor is alluding that B.R. was not credible because of the way he testified. The prosecutor's remark crosses the line into an impermissible opinion because the prosecutor is no longer merely discussing the evidence but expressing an opinion on B.R.'s credibility.

*Even though the prosecutor erred, the errors were harmless.*

The prosecutor erred by: (1) erroneously informing the jury to disregard opinion testimony, (2) inflaming the passions of the jury by directing their attention to the impact on the victim, and (3) improperly stating an opinion on a witness' credibility. The State bears the burden to show beyond a reasonable doubt that "the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman*, 386 U.S. 18).

27

The State points out that the district court accurately provided in Instruction No. 1 that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." See PIK Crim. 4th 50.070 (2012 Supp.). The court instructed on the State's burden of proof in Instruction No. 2 as follows:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty. The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty." See PIK Crim. 4th 51.010 (2020 Supp.).

Juries are generally presumed to have followed the instructions given by the district court. *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003). Moreover, the Kansas Supreme Court has recognized that the instructions given to the jury are a relevant consideration when determining whether any misstatements by the prosecutor had any effect on the verdict. See *State v. Huddleston*, 298 Kan. 941, 956, 318 P.3d 140 (2014) ("[T]he trial court instructed the jury that it was to base its decision on the law and the facts, and nothing suggests the jury did not follow that admonition. Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."). It is presumed that the jury followed Instruction No. 1 and disregarded any prosecutor's erroneous statements complained of which were not supported by the evidence. In addition, the jury is presumed to have followed Instruction No. 2 and held the State to its burden of proof as instructed.

28

More importantly, there was substantial evidence of Jordan's guilt presented in this case. Jordan's consent defense essentially relied on establishing that A.W.'s drug addiction led her to agree to exchange sexual favors for drugs. Multiple witnesses who interviewed A.W. after she reported the rape testified that she did not appear to be under the influence of drugs or alcohol less than an hour after the incident. A.W. also denied using meth before the encounter, either in the days before or the night of the incident. The broken down door also contradicts Jordan's appearance in the house as being consensual. A.W. also consistently provided the same story to witnesses. Given the totality of the evidence presented at trial, any error resulting from the prosecutor's comments was harmless.

III.    *Cumulative error does not require reversal.*

Finally, Jordan argues cumulative error deprived him of a fair trial. This court analyzes claims of cumulative error under a de novo standard. *State v. Ross*, 310 Kan. 216, 227, 445 P.3d 726 (2019). If there is no error or only a single error found, there is no error to accumulate and therefore no basis to reverse a conviction. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012).

The only errors established in this appeal are the three claims of prosecutorial error for specific statements made during opening and closing arguments. To determine whether cumulative error denied Jordan a fair trial, this court must examine these errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019). Since this court has already concluded that the prosecutor's erroneous statements were individually harmless beyond a reasonable doubt, the only remaining consideration is whether they collectively did not affect the outcome of the trial.

Under *Hirsh*, one of the items to consider is how the trial judge dealt with the errors as they arose. In this case, the record reflects no objections were lodged when the prosecutor made the comments in question. As a result, the trial judge was not required to discuss any of the prosecutor's comments with the parties or in front of the jury. The comments were made in three separate areas of the closing argument and were not interrelated or supportive of the others. The comments were brief within the context of an entire closing argument rather than matters that were highlighted or emphasized to the jury. There was significant and overwhelming evidence supporting A.W.'s version of events.

The three errors in question do not result in cumulative error. We find beyond a reasonable doubt that the jury's verdict would not have changed even if the errors had not occurred.

Affirmed.