NOT DESIGNATED FOR PUBLICATION

No. 125,749

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER KAIN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; KEITH SCHROEDER, judge. Oral argument held March 5, 2024. Opinion filed June 28, 2024. Affirmed.

*Kevin J. Zolotar*, of O'Hara & O'Hara LLC, of Wichita, for appellant.

*Michael C. Robinson*, special prosecutor, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE, J., and TIMOTHY G. LAHEY, S.J.

LAHEY, J.: A Reno County jury convicted Christopher Kain of misdemeanor battery. Kain appeals his conviction raising four issues: (1) the appointment of a special prosecutor was invalid and the district court lacked jurisdiction to hear the case; (2) the State failed to present sufficient evidence to support the conviction; (3) prosecutorial error occurred during closing argument; and (4) Kain's statutory right to a speedy trial was violated. For the reasons articulated below, we affirm Kain's conviction.

1

Kain was charged with misdemeanor battery in the Hutchinson municipal court, and the case was scheduled for trial. The charge was dismissed by city prosecutor Michael Robinson on the day of trial. Two months later, Robinson, acting as special prosecutor for the State, re-filed the same battery charge against Kain, this time in Reno County District Court under K.S.A. 2020 Supp. 21-5413(a)(2). Kain requested a jury trial.

Kain filed a motion to dismiss the charge, claiming his statutory and constitutional speedy trial rights were violated. After the district court found no speedy trial violation and denied the motion to dismiss, as part of his argument on a motion to reconsider, Kain claimed "special counsel" Robinson lacked authority to file the complaint in district court because the appointment was not necessary as required by K.S.A. 22a-106. Kain asserted that Robinson's invalid appointment deprived the district court of jurisdiction. The district court denied Kain's motion to reconsider, finding Robinson was properly appointed and that the court had jurisdiction over the case. A jury trial was held in April 2022.

*The jury trial*

Kain is a physician and was working at the Hutchinson Regional Medical Center (HRMC) at the time of the incident. On October 13, 2020, Kain was in the ER to treat a patient, a drug user with a wound about the size of a fifty-cent piece on the palm of her hand. While he was attempting to obtain a culture of the wound with a syringe, the patient began screaming "'[n]o, no, stop, stop'" "at the top of her voice."

Teresa Ellis, the director of the emergency department at HRMC, heard the screaming and headed to the patient's room. Ellis testified that upon entering the room, she observed the patient sitting up on the side of the bed. Kain and another employee

2

were in the room. The patient was screaming "'stop, no, stop'" and crying while Kain was holding the patient's hand and aggressively poking her hand with a syringe. Ellis stated that she put a hand on Kain's shoulder to let him know someone was behind him. Kain told Ellis to put on some gloves and help hold the patient down. Ellis got the gloves and quietly asked Kain if she could get some pain medicine for the patient. Kain told Ellis that he would give the patient pain medication after he was done but could not give a local anesthetic because he was going to culture the wound. According to Ellis, Kain continued to jab at the patient's hand aggressively, to a point where he missed her wound twice and even poked her finger with the needle. Ellis testified that the patient was still screaming "'stop'" and "'no,'" so she quietly told Kain that he should stop because the patient was asking him to stop. Ellis told the jury that she spoke quietly because she did not want the patient to hear or to embarrass Kain.

Ellis testified that Kain stood up, with the needle still in his hand, and said, "'I want you out of here.'" Ellis said she turned around to leave and Kain was behind her and started pushing her using his elbow and his stomach. As Ellis was exiting the room with Kain behind her, she stated she tried to turn around, but Kain grabbed her right shoulder with his left hand and jerked her around and was yelling at her. Ellis testified that she was in front of the door when Kain grabbed her and yelled, but the curtains were closed so they were not visible to the patient. Ellis stated that she had an argument with Kain outside the door, and he was holding her shoulder with his left hand the whole time with the syringe in his right hand. Ellis told Kain not to touch her, and she stated that Kain flinched back and said he was sorry and that he didn't touch her. Ellis testified that Kain was angry at the time and that she found the physical contact offensive. Ellis also told the court that the needle had blood from a patient with a history of narcotic abuse and that it did not have a cap on it.

Photographs showing redness from where Kain grabbed Ellis' shoulder were introduced, and Ellis testified that a day or two later, bruises showing a thumb and finger

3

imprint started to form where Kain grabbed her. A nurse assessed Ellis' condition later that day and testified that she took photographs of a red mark on the front of Ellis' shoulder and red marks across the top and back of her shoulder, consistent with finger marks. The nurse confirmed that the red marks on Ellis were not very visible in the pictures. She followed up with Ellis a few days later and confirmed that the marks on her shoulders had some bruising.

A camera was located on the opposite side of the ER facing the sliding glass door of the room where the incident happened. A privacy curtain blocked the view of the interior. When the video was introduced, Ellis described the events depicted. She acknowledged the video did not show the physical contact between herself and Kain, but it did show Kain directly behind her. Ellis reasserted that Kain was pushing her out with his right elbow, and when she tried to turn around, Kain grabbed her shoulder and spun her back around. Ellis testified that at one point six people responded to the incident.

During cross-examination, Ellis stated that she was aware of the security video but had not seen it until the day of trial. She confirmed she was upset and yelling during the incident and admitted the video does not show Kain pushing her out of the room or whether he was touching her at that time. She explained there was very little space between them, and Kain started to push her out with his belly as soon as he stood up from the stool. She conceded on cross-examination that the physical contact happened inside rather than outside the patient's room as she had testified. Ellis said she did not recall how long Kain had ahold of her and conceded that the video does not show him grabbing her. But Ellis testified again that Kain did so with his left hand and that she and others told him to let go of her. When asked if she was suing Kain for money over the incident, Ellis agreed she was.

On redirect examination, Ellis agreed that because her body was blocking the view of Kain in the video, it would not have been possible to see Kain right behind her. Ellis

4

also agreed that when she was exiting the room, the video shows her left side as Kain grabbed her right shoulder and turned her.

There were four additional witnesses who testified to seeing Kain grab Ellis by the shoulder after she asked Kain to stop the procedure.

Kellie Edwards—an emergency department technician—was the first HRMC employee to join Kain in the patient's room. Kain told her to put on some gloves and help hold the patient down as he was trying to get a culture from the abscess in her hand with a needle. Edwards testified that Ellis had followed her into the room and tried to get Kain to reassess the situation. She stated that Kain then got up from the stool and "bellied" Ellis out of the room, grabbing her shoulder momentarily and spinning her. Edwards stated that she was sitting on the right-hand side of the bed and was able to see directly out the door. She said the grabbing of Ellis' shoulder was only for a brief moment, and she heard Ellis tell Kain not to touch her. Edwards stayed in the room with the patient when Ellis and Kain left the room.

Madison Moore was working at HRMC in the emergency room on October 13, 2020. Like every other witness, she went towards the room because the patient was yelling. Moore stood outside the door and never went inside the patient's room. She told the jury that she saw Kain sitting on a stool in between the privacy curtains and the bed. Kain had a syringe with a needle in his hand, trying to get a sample of the patient's infection. Moore remembered Kain telling Ellis that he could not use pain medication for the test he was doing, and that Ellis was questioning him because she did not feel it was right. She heard Ellis tell Kain that he should stop because the patient was refusing. Kain became very angry and told her to step outside to talk.

Moore remembered Kain grabbing Ellis by her shoulder and spinning her around while they were on the way out of the room. The contact lasted less than five seconds,

5

and she could not recall which hand Kain used to grab Ellis. Moore stated the video showed she was the one opening the door as Ellis and Kain came out and that she stood between them when they were arguing outside the room. Moore testified that Ellis was telling Kain not to touch her and that Kain apologized at first, but he later said he did not touch her.

Elizabeth Thomas was also in the HRMC emergency room when she heard the patient in the room next door yelling so she went to that room. Upon entering, she observed the patient yelling "'stop.'" She testified that she did not remember what was said between Ellis and Kain, but she remembered Kain grabbing Ellis' right shoulder with his left hand because Kain still had the syringe in his right hand. She told the court she witnessed the incident from inside the room as she was peeking around the curtain. Thomas pointed out that she was seen on the video retrieving the syringe from Kain outside the room. Thomas testified that Ellis and Kain were both upset and yelling.

Shari Lindemann was working as the charge nurse at the HRMC emergency department on October 13, 2020. She followed Ellis into the patient's room and saw Kain, another technician, and the patient in the room. Lindemann stated that the patient looked like she was in pain and was screaming "'stop, stop, stop'" to Kain, who was performing a culture of the patient's hand. Lindemann said Ellis asked if the patient had any pain medication, and Kain told her that he would give it to her when they were finished obtaining the culture. Lindemann said Kain proceeded to stick the needle in the patient's hand while she was screaming "stop" and crying in distress. Lindemann testified that Ellis was talking calmly and professionally and told Kain that they should follow the patient's wishes and stop. Lindemann stated that Kain then stood up from his stool, raised his hands saying he wanted to talk to Ellis outside, and he began forcefully "bellying" Ellis out of the room.

6

Lindemann testified that there was physical contact between Kain and Ellis and that she had a clear view of the incident. As Kain and Ellis were leaving the room, Lindemann stated that Kain grabbed Ellis with his left hand and spun her around while yelling very loudly. Lindemann did not feel safe with Kain holding the needle, so she asked if he could give her the needle, but Kain told her no because it was a culture. She told Kain to take his hand off of Ellis. Lindemann then heard Ellis call for security and for the police department. Lindemann also heard Ellis tell Kain to take his hands off of her, and Kain was shaking her with the needle still in his hand. When security arrived, Lindemann testified that Kain was yelling at Ellis, "I did not touch you, Teresa."

After viewing the video, Lindeman acknowledged that it did not show Kain grab Ellis' shoulder. Nonetheless, she testified that she saw Kain grab Ellis' shoulder as they were walking out of the room, and the grab lasted long enough for her to intervene and ask Kain to take his hands off Ellis and to try and step in between them. Lindemann told the jury that she was inside the room and saw Kain physically pushing Ellis out, but the camera angle of the security video could not capture that.

After the State rested, Kain called one witness, Hutchinson police officer Ian McIntire, who responded to HRMC on October 13, 2020. McIntire met with Ellis, who reported that she had an argument with Kain and that he grabbed her left shoulder. McIntire read from his report: "This angered Kain and he held a needle uncapped in his right hand facing upwards and grabbed Ellis on her left shoulder with his left hand. Ellis told Kain, 'Don't touch me.' The two then went out of the room and began to argue in front of the room." McIntire believed the touching happened inside the room. Kain told McIntire that he may have grazed Ellis but didn't grab her. McIntire also told the court that he viewed the security video and noted in his report that it was a verbal argument and that the camera did not show the inside of the room. McIntire testified that he spoke with the staff at the HRMC, who gave consistent statements about the incident.

Closing arguments were made by the parties. The jury returned a verdict of guilty, and Kain timely appeals.

ANALYSIS

I.      *The special prosecutor had the authority to file the criminal complaint in the district court.*

Although he was the city prosecutor who initially filed the battery charge in municipal court, Robinson was serving as "special counsel" for the Reno County District Attorney when he refiled the case in district court. Kain first challenges the validity of Robinson's appointment as a special counsel under K.S.A. 22a-106. He argues that the requirements for Robinson to be appointed were not met, and as a result, the district court lacked jurisdiction to hear the case.

Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). Moreover, whether jurisdiction exists is a question of law, subject to unlimited appellate review. *State v. Hillard*, 315 Kan. 732, 775, 511 P.3d 883 (2022). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022).

Kain has the burden of designating a record that establishes the claimed error. Without such a record, an appellate court presumes the district court's action was proper. *State v. Liles*, 313 Kan. 772, 783, 490 P.3d 1206 (2021); see also Supreme Court Rule 6.02(a)(4), (a)(5) (2024 Kan. S. Ct. R. at 36) (appellant has the burden to furnish a sufficient record to support the claims of error; appellant's claims of error must be supported with specific citations to the record on appeal).

8

*The appointment of the special counsel was not invalid.*

A district attorney has the duty to prosecute all matters arising under the laws of the State. K.S.A. 22a-104. The district attorney is authorized by K.S.A. 22a-106(a) to hire assistant district attorneys and staff to carry out his or her responsibilities. And the district attorney is allowed to appoint "special counsel *when necessary* to assist the district attorney in the discharge of his duties." K.S.A. 22a-106(d). (Emphasis added.) Though Robinson was the Hutchinson city prosecutor, he was acting as special counsel on behalf of the Reno County district attorney when he filed the charge in district court.

Kain concisely summarizes his contention in his brief:

"It was not necessary for the Reno County District Attorney to appoint a special prosecutor to fulfill his duties as District Attorney and thus was invalid. The district court lacked jurisdiction because the complaint was filed by a special prosecutor who was not lawfully appointed. This Court should find the special prosecutor lacked the authority to file the complaint and prosecute this case and thus the district court lacked jurisdiction."

Kain points out that the district attorney had no necessity to employ a special counsel because this was a municipal court case which did not involve the district attorney. Thus, there was no necessity for the district attorney to do anything.

At the pretrial hearing on Kain's motion to dismiss on speedy trial grounds, the district court asked Robinson why he was appointed to this case, and he told the court:

"Mere judicial economy so I don't tie up municipal court and have to retry the cases multiple times. It cuts down on having to keep civilian witnesses from spending the day in municipal court and then have to come back here and spend the day up here. So not only does it free up courts, but it also lessens the burden on civilian witnesses, Your Honor."

Robinson told the court he had a standing appointment as a special prosecutor for the past 10 or 15 years, explaining:

> "By the way of history, Your Honor, how it actually got started was we would have D.U.I. trials. Obviously municipal court is not a court of record, but many defense attorneys began bringing court reporters to the courtroom and then knowing that they were going to lose and appeal it, and then they would use the record that their court reporter took so that's kind of how actually it got somewhat started, but the real reason is just so it doesn't tie up—you don't have to try the cases twice and book witnesses. Officers always have schedules, jobs, that type of thing, so sometimes it's hard to schedule them so it's all to save time and expense, Your Honor."

Kain argues that the reasons given relate to Robinson's interests as a municipal court prosecutor and that there is no nexus between the judicial economy rationale identified by Robinson and the district attorney's responsibilities. We agree that the explanation given by the special prosecutor identifies only his own rationale for his appointment—it does not provide the district attorney's perspective on why Robinson's appointment was necessary. And under K.S.A. 22a-106(d), it is the district attorney who decides when special counsel is necessary to assist in the discharge of its duties.

The issue over the special counsel's appointment was presented by way of argument to the district court—no evidence was presented. Consequently, the precise timing and terms of Robinson's appointment are not part of the record. From the arguments made before the district court, it appears that Robinson has a standing appointment as special counsel, which allows him to file cases on behalf of the district attorney for violations of state law. But the parameters of the appointment were not presented to the district court. The district attorney—the only person authorized to make the appointment—did not testify at the hearing and provide the rationale for Robinson's appointment. In the absence of evidence of the scope of the appointment and the district attorney's testimony about the necessity for the appointment, we lack a sufficient record

10

and factual basis from which we can determine whether Robinson's appointment violates K.S.A. 22a-106(d).

Kain's jurisdiction argument is based on a claim that Robinson was not properly appointed as special counsel and could not therefore prosecute offenses under state law. Because we conclude Kain failed to establish that Robinson's appointment was invalid, his jurisdiction argument necessarily fails. Kain was charged with and convicted of misdemeanor battery under state law for events that occurred in Reno County, a crime squarely within the jurisdiction of the district attorney. See K.S.A. 22a-104.

II.     *There is sufficient evidence to support Kain's conviction.*

Kain next argues that the State failed to meet its burden of proving that he was guilty beyond a reasonable doubt.

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

"This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

*Sufficient evidence supports Kain's conviction of misdemeanor battery.*

Kain was convicted of one count of battery, under K.S.A. 2020 Supp. 21-5413(a)(2), which states:

> "(a) Battery is:
>
> (1) Knowingly or recklessly causing bodily harm to another person; or
>
> (2) knowingly causing physical contact with another person when done in a rude, insulting or angry manner."

The jury instruction provided by the district court contained nearly identical language:

> "1. The defendant knowingly caused physical contact with Theresa R. Ellis in a rude, insulting, or angry manner.
> "2. This act occurred on or about the 13th day of October, 2020, in Reno County, Kansas."

Kain does not specifically point to a failure of proof as to either element the State was required to present. He acknowledges "there were witnesses who testified to seeing the alleged contact that constituted the battery." Nonetheless, Kain argues that a rational juror could not have watched the video and concluded beyond a reasonable doubt that the alleged physical contact occurred as Ellis described it. The crux of Kain's argument is that the security video does not show physical contact between Kain and Ellis, so her direct testimony that it occurred outside of the patient's room means the incident would have been captured on the security video if it had occurred as she alleged. The argument is unpersuasive.

The security video does not definitively show Kain making physical contact with Ellis before or after exiting the room. The curtain in the room shields from view whatever occurred within the confines of the room. Yet, while the video may not show the physical contact by Kain as described by Ellis, there are four eyewitnesses whose testimony either singularly, or in combination with other witnesses, establish facts sufficient to support the conviction. In the light most favorable to the State, the evidence overwhelmingly supports the conclusion that Kain became angry when Ellis told him to stop the procedure and that, in the course of "bellying" Ellis towards the door, he grabbed her shoulder. As

set forth in detail at the outset of this opinion, the testimony of Moore, Thomas, Lindemann, and Edwards corroborates the essential elements of the battery charge and Ellis' story. And the photographs and testimony of the nurse who examined Ellis further corroborates Ellis' claims. Kain's argument is essentially that the jury should have attached more weight to the content of the security video and discounted the eyewitness testimony of multiple hospital employees. Again, this court does not reweigh the evidence or pass on the credibility of the witnesses. *Aguirre*, 313 Kan. at 209. Such are duties solely delegated to the jury.

Reviewing the record in the light most favorable to the State, we find that a rational fact-finder could conclude that Kain committed a misdemeanor battery when he made physical contact with Ellis.

Kain also incidentally mentions that there were two acts that could constitute battery—the "bellying" and grabbing of the shoulder—and because the jury was provided a unanimity instruction, this court must determine whether it was impossible for the jury to unanimously agree on the underlying incident. Yet this issue was not raised below, and Kain fails to argue preservation of the issue. Issues not raised before the district court cannot be raised on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). Kain also failed to adequately brief the issue, and it is deemed waived. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

III.    *The prosecutor did not commit reversible error in closing argument.*

Kain next argues that the prosecutor erred during closing argument by (1) stating the witnesses were "all being honest to the best of their ability" and (2) stating that, even with a high definition video, "it wouldn't have shown any contact because [Ellis] was

actually blocking" the view. Kain claims that because the evidence presented in the case was weak, the special prosecutor's comment requires reversal of the conviction.

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citations omitted.]" *Sherman*, 305 Kan. at 109.

See *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019). Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmless test. *Sherman*, 305 Kan. at 114.

14

*It was prosecutorial error to offer a personal opinion on the honesty of the witnesses.*

Kain's first contention is that the special prosecutor improperly commented on the credibility of the State's witnesses. Specifically, Kain challenges the following remark made by the prosecutor during his closing statement:

> "I think just the fact that there are some minor—and I call them minor—inconsistencies it tells me that they're all being *honest* to the best of their ability. So, again, I harken back as he did to the jury instructions. Go to Number 3 and decide what weight you give the witnesses and what weight you give the video and then I'm asking that you make a finding of guilty, but that obviously is your decision to make." (Emphasis added.)

Kain argues that the prosecutor vouched for the credibility of the witnesses by stating that he believed they were honest. The State simply contends that the special prosecutor's comment did not endorse the witnesses' credibility.

Prosecutors are generally afforded a wide latitude in crafting closing arguments to address the weaknesses of the defense. *State v. Watson*, 313 Kan. 170, 176, 484 P.3d 887 (2021).

> "This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. For instance, '[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met, and an appellate court must then consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. [Citations omitted.]" *State v. Killings*, 301 Kan. 214, 228, 340 P.3d 1186 (2015).

15

When determining whether the prosecutor's statement falls outside the wide latitude given to the prosecutor, the appellate courts do not analyze the statement in isolation but consider the context in which the statement was made. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). "Often the line between permissible and impermissible argument is context dependent." *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020).

A review of the record here shows the comment made by the prosecutor was in the second portion of his closing argument and was in response to Kain's argument regarding inconsistencies in witness testimony. The prosecutor was agreeing with defense counsel that all the witnesses' testimony did not necessarily align. He reminded the jury that the witnesses had not watched the video before the trial and that it has been a year and a half since the incident, so there could be a few inconsistencies. The prosecutor then said:

> "If I had let them all watch the video and had I, you know, gone through everything with them then maybe their statements do gel, but I think just the fact that there are some minor – and I call them minor – inconsistencies *it tells me that they're all being honest to the best of their ability*. So, again, I harken back as he did to the jury instructions. Go to Number 3 and decide what weight you give the witnesses and what weight you give the video and then I'm asking that you make a finding of guilty, but that obviously is your decision to make."

A prosecutor is permitted to craft arguments that draw reasonable inferences from the evidence and explain to the jury "what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses." *State v. Lowery*, 308 Kan. 1183, 1207, 427 P.3d 865 (2018). However, "'a prosecutor may not state his or her personal belief as to the reliability or credibility of testimony given at a criminal trial.' [Citation omitted.]" *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015). Our Supreme Court has long held that it is "'improper for a prosecutor to attempt to bolster the credibility of the State's witnesses.' [Citation omitted.]" 303 Kan. at 428.

16

Here, the prosecutor plainly said, "I think" when offering his personal view that the inconsistencies in witness testimony "tells me that they're all being honest to the best of their ability." To the prosecutor's credit, he then told the jury to refer to the court's "weight and credit" instruction and that it was their job to decide "what weight you give the witnesses." While the prosecutor's concluding comments were appropriate, we find the prosecutor's comment "it tells me that they're all being honest to the best of their ability" is prosecutorial error both as an improper injection of the prosecutor's personal belief and as an attempt to bolster the credibility of the State's witnesses as a whole.

*The prosecutor did not misstate the facts.*

Kain next argues that the prosecutor committed prosecutorial error by misstating the facts in the evidence. He claims that the special prosecutor falsely stated that even if there were a high-definition camera, the contact between Kain and Ellis could not have been shown. Kain challenges the special prosecutor's following comments in the closing argument:

> "But as Ms. Ellis and Dr. Kain exited the room Ms. Ellis is in front of Dr. Kain. She is between him and the camera, *so even if we did have high definition video it wouldn't have shown any contact because she was actually blocking it* and that's unfortunate, but the fortunate part is there were two witnesses that were actually inside the room and saw that contact and testified to that." (Emphasis added.)

He asserts that the special prosecutor stated as a fact that it was impossible for the crime to be captured by the camera and that such comment was erroneous because it was not supported by the facts, and he contends it lessened the State's burden of proof. We disagree. The testimony of the police officer called by Kain was consistent with other witnesses that events occurring within the patient's room could not be seen by the camera, and it was not controverted by any witness that the patient privacy screen blocked the

17

inside of the room from the view of the camera. Additionally, witnesses Elizabeth Thomas and Kellie Edwards both testified they observed Kain grab Ellis' shoulder inside patient's room as both initially remained in the room when Kain and Ellis exited.

We agree with the State that that the prosecutor's comment about the security video was a factual statement and did not suggest that the jury should disregard it as evidence. The prosecutor's statement was consistent with Ellis' testimony on redirect examination. She was asked:

"Q. . . . There's someone looking in and you can see in from that vantage, correct? Door comes open. Right there. I'm going to try to play that back if I can. He's directly behind you, correct?

"A. Yes.

"Q. Okay. At that point you're coming straight at the jury—well, I'm a little— a second behind but anyway, you were coming straight out towards the camera?

"A. Yes.

"Q. So your body was blocking the camera's view of him. That's him directly behind you, correct?

"A. Yes.

"Q. So the jury and the camera can't see that?

"A. Correct.

"Q. It's physically not possible?

"A. Yes, sir."

The prosecutor was simply pointing out a deficiency in the video that was based on witness testimony.

Viewed in context, the prosecutor was fairly and appropriately comparing evidence and pointing out the limits of the video. In his argument, the prosecutor directed the jury to consider the video, saying, "Where I do agree with Mr. Zolotar is do look at

the video." Moreover, immediately after the prosecutor's comment about the security video, the prosecutor said, "So, again, I somewhat caution you to weigh everything on the video." The prosecutor added that the video was far away and fuzzy and much of what was mentioned by the witnesses, such as the syringe in Kain's right hand, could not be seen in the video. A prosecutor's closing argument is reviewed in its entirety and in the context in which they were made and not in isolation. *Ross*, 310 Kan. at 221.

The prosecutor did not misstate the facts or dilute the State's burden of proof in his closing argument, and we find the prosecutor's comments about the security video did not fall outside the wide latitude afforded to the prosecutors in closing argument.

*Kain was not prejudiced by the State's closing argument.*

In the second step of the *Sherman* analysis, we must determine whether the prosecutor's error in commenting on the credibility of witnesses prejudiced the defendant's due process rights to a fair trial. See 305 Kan. at 109. Kain must establish that any error by the prosecutor prejudiced him under the constitutional harmless standard to succeed on his claim. 305 Kan. at 109.

In determining whether a prosecutorial error prejudiced the jury, appellate courts must consider the extent of any ameliorating effect of a jury admonition attempting to remedy any such error. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015). Moreover, "[t]he prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof." *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012).

The district court properly instructed the jury on the State's burden of proof. The jury was also appropriately instructed by the district court that the weight and credit to be given to the testimony of each witness was to be determined by the jury. The jury was

19

instructed that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Jurors are presumed to follow the instructions provided by the district court. *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003). Kain did not claim that the jury failed to follow instructions or that the jury instruction on the issues at hand were improper.

Prosecutorial error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citations omitted.]" *Sherman*, 305 Kan. at 109. The evidence in this case is overwhelming and one-sided in support of the guilty finding. Stated another way, there were no eyewitnesses who affirmatively testified that Kain did *not* make physical contact with Ellis. Four eyewitnesses and the victim all testified that Kain grabbed Ellis' shoulder under circumstances that plainly convey that Kain was angry. The jury was properly instructed, and even the prosecutor who committed the error immediately reminded the jury that it was the jury's responsibility to determine the weight to be assigned to witness testimony. We conclude the State has demonstrated there is no reasonable possibility that prosecutorial error contributed to the verdict.

Additionally, Kain incidentally raises a cumulative error claim in the alternative. The State did not respond to Kain's cumulative error claim in its brief on appeal. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). Because the cumulative error doctrine does not apply when, as here, there is a single error by the district court, Kain's claim necessarily fails. *State v. George*, 311 Kan. 693, 709-10, 466 P.3d 469 (2020).

IV.    *Kain's statutory right to a speedy trial was not violated.*

Lastly, Kain argues on appeal that his statutory right to a speedy trial has been violated.

A defendant's statutory right to a speedy trial presents a question of law subject to de novo review. *State v. Burnett*, 297 Kan. 447, 451, 301 P.3d 698 (2013). And to the extent this issue requires the court to engage in statutory interpretation, that also presents a question of law subject to unlimited review. *State v. Eckert*, 317 Kan. 21, 27, 522 P.3d 796 (2023).

Kain does not argue that his statutory speedy trial rights under K.S.A. 2020 Supp. 22-3402 were violated. But he makes the novel argument that because this case was originally charged and set for trial in municipal court, we should apply the municipal court speedy trial statute, K.S.A. 12-4501. He presents no authority for his contention that because his case was originally a municipal court case, the municipal court speedy trial statute applies. We are unpersuaded there is any reason why we should apply a municipal court statute to a state law prosecution. Accordingly, we find no violation of Kain's speedy trial rights.

Affirmed.